# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

_____

|  |  |  |
|---|---|---|
| | ) | |
| **BRIAN KEITH FEATHER**, | ) | Franklin County Chancery Court |
| | ) | No. 13,840 |
| Plaintiff/Appellant. | ) | |
| | ) | |
| VS. | ) | C.A. No. 01A01-9704-CH-00183 |
| | ) | |
| | ) | |
| **DOLLY DEKRAFFT FEATHER**, | ) | |
| | ) | |
| Defendant/Appellee. | ) | |
| | ) | |

**FILED**

**April 3, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

From the Chancery Court of Franklin County at Winchester.
**Honorable Buddy D. Perry, Judge, Sitting by Interchange**

**Clinton S. Swafford**, SWAFFORD, PETERS & PRIEST, Winchester, Tennessee
Attorney for Plaintiff/Appellant.

**Lucinda E. Smith**, DODSON, PARKER & BEHM, Nashville, Tennessee
Attorney for Plaintiff/Appellee.

OPINION FILED:

**AFFIRMED AS MODIFIED AND REMANDED**

**FARMER, J.**

**HIGHERS, J.**: (Concurs)
**TOMLIN, Sr. J.**: (Concurs)

This somewhat protracted litigation began in August 1993 when Brian Keith Feather (Husband) filed for divorce from Dolly deKrafft Feather (Wife). A divorce decree was entered by the chancery court in September 1994, which, *inter alia*, dissolved the fifteen year marriage of the parties and determined custody of their four minor children. Separate orders pertaining to the case were entered by the trial court in August and October, 1995, respectively. Both parties appealed therefrom, but this Court in April 1996, determined that the parties' respective appeals were from a nonfinal judgment. Litigation thereafter continued due to the parties' filings of various petitions for contempt, to rehear and to modify custody. After additional hearings, the trial court entered its final judgment in December 1996 from which both parties have appealed.[1] The primary issues before us concern the trial court's decisions regarding child custody and classification and division of the marital estate. For the reasons hereinafter stated, we affirm as modified.

The parties married in Alabama in 1978. Husband thereafter received his Bachelor's Degree in mechanical engineering and they moved to Virginia to accommodate Husband's newfound employment. Wife, at the time, was working on an Ed.D. degree with an emphasis on early childhood development. The parties moved to Tennessee in 1986 in order for Husband to accept a better paying position. His current annual earnings are approximately $50,000.

Much of the controversy in this matter concerns the parties' four children: Morgan, Rebecca, Daniel and John, ages 13, 11, 9 and 3, respectively, at the time of the original divorce hearing. Upon moving to Tennessee, the children were enrolled in the public school system as they became age appropriate. Through various achievement and IQ tests, the three older children have qualified as gifted with a superior IQ range. When Morgan was enrolled in the sixth grade, he regularly experienced migraine headaches resulting in many absences from school. The school system notified the parties that Morgan could fail due to his many absences irrespective of the fact that he had the highest GPA in the school. This incident, along with the fact that the children were considered gifted, led the parties to conclude that they should be home schooled. At the time of the hearing, Wife had home schooled the children for approximately one and one-half years. The eldest child was also enrolled in a few classes at a local area community college, Motlow.

---

[1]Husband has been designated the appellant for purposes of this appeal.

The proof presented at the original hearing establishes that the parties disagree as how best to raise their children, in almost all respects: from education, discipline to religion. Husband testified that Wife actively kept him from participating in the home schooling of the children. He claimed that he "was the only parent who really disciplined the children" and that "[Wife] . . . regularly stated that children should do whatever they want. They should have complete freedom to explore creative pursuits." Husband believed Wife's lack of discipline detrimental to the children. He testified that he and his daughter's relationship was somewhat strained and that she, whom he described as "rebellious," had always been closer to her mother. He further described instances when Wife refused to allow the children to participate in the court ordered visitation. With respect to religion, Husband described Wife's "goal" as to provide the children with a "broad survey of all the world's religions." He stated that Wife had attempted to prevent the children from attending church with him.

If awarded custody, Husband planned to place the children back in either the public or private (depending on his resources) school system. He believed that the home schooling had become "very detrimental" for the children and emphasized their lack of opportunity for socializing with other children. On cross-examination, Husband confirmed that the children were participating in soccer and karate classes and also attended a public school program, Excel, once a week.

Wife stated that she possessed one level above a master's degree in early childhood and elementary education and had completed several courses concerning children's learning disabilities. She disagreed that the children should return to the public school system, noting that Morgan was already taking college classes and that placing him back in the eighth grade would be detrimental to him psychologically. She continued that Rebecca has attention problems, possibly ADD, and needed a different type program than the typical classroom setting. She believed the normal classroom environment inappropriate for Daniel primarily because of his speech impediment. She identified another reason as being that the children are "all so academically above everybody else . . . ."

Wife stated that the children were home schooled four hours per day for 180 days a year. She explained that there is no structured time or setting regarding the children's schooling and

that sometimes she specifically teaches them and that at other times they are "on their own." Much of the home schooling involves the children "just reading various things." She described Husband as "irresponsible" where the children were concerned and expressed concern for the youngest child's safety while in the care of Husband, unless Morgan was also present. Wife denied disapproving of the children's attending church, but stated that she had problems with the particular Presbyterian Church they attend. She believes it important for her children to understand different religions and that one does not "have to follow any specific church's rules to get to Heaven."[2]

At a later hearing on the matter,[3] testimony was presented regarding the parties' personalty. Wife stated that there were presently fifteen horses on their farm. She purchased four during the marriage, in part, with money she inherited from her father and ten were bred on the farm (one other was a gift). The parties did not dispute that the care of the horses was primarily Wife's responsibility. Husband testified that the marital residence was purchased in 1987 for $120,000. The parties made a down payment of $40,000, with $16,000 derived from the sale of their prior home in Virginia and $24,000 from monies Wife inherited from her father. The parties also testified that they had used a portion of Wife's separate assets to pay marital debt, but disputed the exact amount. Husband testified that the amount loaned to them was $10,000; it was Wife's testimony that it was approximately $19,000 to $20,000.

The divorce decree declared the parties divorced and awarded them joint custody, with Wife receiving primary physical custody. Wife was awarded child support and rehabilitative alimony. She also received the marital residence, which the court valued at $120,000 and the accompanying indebtedness of $84,000, leaving an equity of $36,000. However, the court found that a portion of the down payment on the home ($24,000) was paid from Wife's separate property, thereby reducing the equity to $12,000, which the court divided equally. The court found that the horses constituted marital property and awarded them to Wife. The court determined the equity in the horses at $36,850, of which $11,000 was awarded to Husband and the remainder to Wife.

---

[2]The parties' eldest child also testified at this hearing and expressed a preference to reside with his mother with visitation rights accorded his father. He further indicated a desire to eliminate some of the visitation time with his dad "over the summer."

[3]The original divorce hearing was held February 8 and 11 and July 18, 1994.

Husband received his $10,000 401K plan and a life insurance policy with a cash surrender value of $800. The court ordered Husband to repay Wife the sum of $19,000 and further found that "[t]his indebtedness was reduced by the entire net amount of the marital property that would have otherwise been awarded to [Husband] leaving a balance owing by him to [Wife] in the amount of $15,200.00." Husband was also ordered to repay certain other marital debt. Finally, the court divided the parties' personalty.[4]

After entry of the decree, both parties filed petitions to rehear. Wife also filed a petition to modify with respect to Husband's visitation rights and two separate petitions for contempt. A hearing was held in April 1995. Wife testified that she requested a change in visitation because the children wanted to be with her and that they were frequently being left alone at Husband's home while he participated in his own personal activities. Husband explained that he had left the children at his home alone on occasions when he had gone to parties with his Sunday school class or on dates. He considered Morgan, age 14 at the time, capable of properly supervising the other children. He denied any neglect of the children. He admitted that he and his daughter Rebecca continued to have "a very difficult situation." Both Morgan and Rebecca testified at the hearing. Rebecca expressed her preference that she have no visitation with her father. Morgan preferred to spend the time when his father was not going to be at home with his mother.

The court denied the motion to reconsider, but modified the visitation schedule to allow less time to Husband by one weekend per month and ordered Husband to return the children to Wife during the time of their scheduled visitation if he planned personal activities that would exclude them. The court did not address Husband's alleged contempt and reserved, for possible further hearing, the issue regarding payment of the children's medical bills.[5]

In June, Wife filed a petition to modify custody to allow her to remove the children from Tennessee and relocate to Tucson, Arizona. The petition alleged that Morgan had received an offer for admission to the University of Arizona and that such move was in the best interests of all

---

[4]The decree also denies two petitions for contempt filed by Wife prior to its entry.

[5]The trial court's order was entered August 11, 1995.

four children. The petition requested that Wife be awarded sole custody. Husband responded that there had been no material change in circumstances to justify modification of the decree. He claimed that Wife's petition was further example of her "vindictive actions" towards him. Husband requested that the court grant him more time with the children.

At the hearing, Husband testified that since the last hearing he had begun taking Rebecca to a Christian counselor. He stated that he had attempted to explain Christian philosophy to his daughter, but denied making such negative comments to her as she was "going to hell." He stated that Morgan was doing "poorly" in school and had had to withdraw from two classes at Motlow State Community College for failing grades. He preferred that Morgan attend classes at Motlow suitable to his educational level rather than home schooling by Wife. He saw no advantage in having his fourteen year old son attend college on a full time basis.

Wife confirmed that the University of Arizona has a program specifically for gifted children. She chose Tucson because it would allow Morgan to attend college and still be able to socialize with other children of his own age. She stated that there were no students of Morgan's age enrolled at Motlow. She also believed it would benefit Morgan to be near his older sister, Wife's adult daughter from a previous marriage, who resides there. She did not believe Morgan was traumatized by failing to complete two of the courses at Motlow and that he "has loved" going there where he maintains a B average. She admitted that she and the children had only once visited the Tucson area. She stated that there were also excellent programs for gifted children within the public school system for her other children. She expressed a desire to place the children back in public school but did not believe her children could receive adequate schooling in Tennessee. As far as visitation with their father, she suggested "Christmas and vacations." She believed the children would "be happier not being with [their father]."

June Patton, a support team coordinator with the Franklin County Board of Education responsible for testing children in the school area, testified that she had had considerable contact with the three older Feather children during the last seven or eight years. She believed they could "absolutely" benefit from the county educational system. She stated that not all gifted children should begin school early or be promoted faster. She explained that if a child is intellectually gifted

there are still many other factors to consider such as socialization and the specific child's maturity level. She had observed Morgan exhibit considerable anxiety on various occasions, including when he was being tested. She did not believe that it was wise to send Morgan to the University of Arizona based upon her own work with him. She explained, "Morgan is a very, very bright child . . . But even if you're very . . . bright, you don't skip five or six or seven grades. It's . . . not a good thing to do. Socially it's a disaster. . . . It's asking too much of Morgan intellectually . . . . it's just too much pressure."

By order entered October 5, 1995, the trial court denied the petition, finding no material change of circumstances to require modification. In ruling from the bench, the trial court noted that the petition had more to do with getting Husband out of his children's lives and not about the best interests of Morgan.[6]

In May 1996, Wife filed a second petition to modify custody and visitation to allow her to relocate with the children to Arizona. The petition once more set forth the alleged academic benefits of such a move and additionally asserted that Husband's behavior toward the children with respect to his views on discipline and religion were having a detrimental impact on them. Thereafter, Husband filed a petition for contempt for Wife's alleged violation of the court ordered visitation. Wife responded by admitting that "technically" she was in contempt, but cited "extenuating circumstances." After a hearing, the trial court entered its judgment addressing those issues which had rendered its prior rulings nonfinal and denied Wife's petition to modify. The court, however, modified its prior order to award custody of the two younger children to Husband, with visitation to Wife. The court specifically found that Wife had "intentionally, maliciously, and successfully alienated the two older children from their father, and it would be fruitless for the Court to attempt to change custody of [them]." The court additionally found Wife in contempt for violation of its orders regarding visitation and confirmed the property settlement provisions in the divorce decree.

We perceive the issues on appeal as follows:

---

[6]Both parties filed notices of appeal from this order. In April 1996, this Court entered an order dismissing the parties' appeal without prejudice inasmuch as the divorce decree failed to address Wife's claim for attorney's fees and the August 11, 1995 order did not address the issue of Husband's alleged contempt and expressly reserved another issue.

I.   Whether the trial court erred in awarding the appellee $24,000.00 of the equity in the marital home where the home was purchased after marriage, the down-payment was made with funds from appellee's inheritance and funds from the sale of a previous marital home, the mortgage payments were made from appellant's income and the property was titled in both husband and wife as tenants by the entirety.

II.   Whether the trial court erred in ordering the appellant to repay the entire $19,000.00 that appellee withdrew from her separate account to pay joint marital obligations and family expenses.

III.   Whether the trial court erred in its total division of marital assets and marital debts, including the apparent miscalculation that failed to give the appellant credit for his stated equity in the house of $6,000.00 and equity in the horses of $11,000.00 since the appellee received the total ownership of the house and the horses.

IV.   Whether the trial court was correct in denying the appellee's petition to relocate the parties' four children to Arizona.

V.   Whether the trial court was correct in ultimately granting custody of the two younger children to the appellant.

Wife raises the additional issue of whether she is entitled to attorney's fees incurred in this appeal.[7]

We first address the issue of child custody.  The court in *Musselman v. Acuff*, 826

S.W.2d 920 (Tenn. App. 1991), states:

> The scope of review in custody cases is *de novo* upon the record accompanied by a presumption of correctness, unless the preponderance of evidence is otherwise.  *Hass v. Knighton*, 676 S.W.2d 554 (Tenn. 1984).  The paramount consideration in a custody proceeding is the best interest of the child.  When the issue before the Court is whether to modify a prior custody order, it need not repeat the comparative fitness analysis that is appropriate at the time of the original custody [decree].  *See e..g., Bah v. Bah*, 668 S.W.2d 663 (Tenn. App. 1983).  Instead, in a modification proceeding, the trial judge must find a material change in circumstances that is compelling enough to warrant the dramatic remedy of changed custody.  *See*, Tenn. Code Ann. § 36-6-101(a); *Woodard v. Woodard*, 783 S.W.2d 188 (Tenn. App. 1989); *Dailey v. Dailey*, 635 S.W.2d 391 (Tenn. App. 1981).  Moreover, the burden is on the non-custodial parent to prove changed circumstances.

*Musselman*, 826 S.W.2d at 922.

---

[7]Although Wife raises the issue of whether she should have been awarded sole custody at the time of the original divorce decree, we are concerned with the trial court's final judgment only.

With respect to Wife's petition to modify, she testified at the hearing that the changes that had occurred since the first petition to modify were Husband's strict religious views and his views on the children's diets, the children's health, particularly their headaches, which she attributed in part to the stress between she and Husband, and the fact that the children were no longer in the county Excel programs offered by the public school system. Other changes were identified as her increased awareness of the educational opportunities available to the children in Arizona and "[Husband's] continual abuse of the children." In addition, she cited the "children's refusal to go for visitation." She commented, however, that "[a] lot of it is just the continuation of what he was doing before."

The headaches Wife mentioned concern children Morgan and John, although she admitted that Morgan had endured headaches prior to the filing of the divorce petition. She also believes they could be due in part to allergies and sinus. She admitted that the older children had not visited with their father since April, but denied initiating or prompting such behavior and that the younger two had not visited with him since June. Wife admitted that she had refused to allow the children visitation with their father because of their headaches and stress. She believed the children should have a relationship with their father "as long as it's not causing them serious problems" but did not believe this a possibility. She claimed that Husband disapproved of the children's vegetarian diets and that his conflict with them over such had increased tremendously. She believed that Morgan had progressed academically to the point that she was no longer qualified to teach him. She expressed concern that Husband's strict religious beliefs were causing the children stress, including his comments to them that Wife was going to hell if she did not accept Jesus. Finally, Wife stated that because of the children's home school status, the county had denied them eligibility for any of the gifted programs provided by its public school system. If allowed to move to Arizona, she intended to place the children back in public school and return to work. She continued to home school the children because the Franklin County school system did not meet their needs. By way of example, she noted that there were 17 advanced placement courses offered in the high schools in Tucson as opposed to two in the county. She believed Morgan ready for college on a full time basis. She described Husband's relationship with the children as "very bad" and that it had "gotten worse." On cross-examination, Wife confirmed that Motlow would allow Morgan to continue his courses there if he were also enrolled in the county school system.

Morgan testified that within the past year, his relationship with his dad had "declined" and "become more tense, more confrontational." He noted that Husband had made "negative references" to him regarding his diet and that he exhibits hostilities toward his exploration of other religious thinkings. Educationally, Morgan did not believe his father was trying to do what was best for him and that his removal from Motlow was indirectly due to his dad's actions. He ceased visitation with his dad because he preferred being with his mother. As to future visitation, he did not want to discontinue it completely but preferred it be on a voluntary basis on his part.

Rebecca, too, described her relationship with her father as "very bad." She stated that she did not love her father; that he "belittles" her; and that she did not like his stern stance on religion or his disciplinary methods toward her. She stated that her attitude toward her father had not changed in the past year.

Husband testified that his religious views had not changed within the preceding year other than the fact that he had "experienced steady spiritual growth." During their scheduled visitation, he had taken the children to church on a regular basis. John and Daniel recently attended two sessions of a confirmation class. He believes the children enjoy attending church. He admitted being "harsher" than he would have liked in disciplining the children, particularly the two oldest. As to the children's diet, he just encourages them to eat healthy and is concerned about whether they receive enough nutrients. His relationship with Rebecca continued to be strained. He is prepared to care for all four children, but admitted that custody of the two older children would be "very difficult" but he believed it "important." If the children were allowed to move to Arizona, Husband believed that he would lose contact with them and that Wife would continue to attempt to alienate them from him. Husband stated that on the days he had the children he would plan activities, such as playing games, watching videos, or eating pizza, or as he described, "[j]ust family fun." He has consulted physicians regarding John's headaches and gives him whatever medications are prescribed. When asked, "[h]ow frequently do you indicate to the children that someone, . . . was going to burn in hell . . . ?", he replied:

> I don't often use those phrases. My children have often focused on that when they have come back to kind of argumentatively talk to me about that. We may be talking about something, a

completely different issue, and Morgan will say, does that mean that I'm going to burn in hell?  And I say, well, if you don't accept Christ, there's no alternative.

But let me tell you the good story.

He agreed that Wife also took the children to his church as well as another local area church.

After hearing the evidence, the trial court made the following findings:

The proof did not support the allegation in the Petition to Modify . . . that there had been a material change of circumstances justifying a modification of the Decree with regard to custody since the Order previously entered on October 5, 1995, denying such a Petition to Modify based on similar allegations.

The proof did not support the allegation of the mother that the father had been hostile toward the two older children.  There is amply proof that Rebecca is hostile toward her father. . . .

. . . .  The proof supports the allegations that the religious beliefs of the parents as taught to the children are different.  Their differences are having a detrimental impact on the children.

The Court finds that the mother is not a credible witness.  The Court further finds that the mother has willfully and intentionally attempted to undermine the father's relationship with the children, and her conduct has substantially contributed to the deterioration of the father's relationship with the two older children.

. . . .  There is proof that the Tennessee school system is adequate for these children.  The Court finds that the plan to move to Arizona is primarily designed to undermine the father's relationship with the children.

. . . .

The mother admits that she refused to allow the father to exercise his visitation privileges after June 12, 1996, as alleged in his Petition for Contempt.  She made self-diagnosis that both Morgan and John had stress related headaches caused by their visitation with their father. . . .  Proof by both parties supported the allegation that the father had a very difficult time even talking with the children on the phone.

. . . .

. . . . it is the judgment of the Court that the mother intends to deprive the father of contact with the children and that she has deliberately and intentionally attempted to alienate the children from their father, and the move to Arizona is designed to destroy any relationship the father might have with the children.

Upon review of the record, we conclude that a preponderance of the evidence supports the trial court's findings on this issue. Most telling, is Wife's testimony that a lot of the circumstances on which she bases her position were merely a continuation "of what [Husband] was doing before." We note also, somewhat curiously, this Court's observation that some of the children's testimonies regarding their father's behavior were repetitive and, at times, almost mimicking of that of their mother's testimony.

As to the trial court's decision to modify its prior order to grant custody of the two youngest children to Husband, we find the record supportive. Clearly, both parties love their children but each has drastically different views as to how the children should be raised, on almost every aspect of their lives. Unfortunately, the proof establishes that both parties have involved the children, even the youngest to some extent, in their own acrimonious relationship. (From the record it appears that the 2 older children testified in almost every hearing on the matter.) It appears, however, that Wife is most at fault in this regard. We agree with the trial court that Wife has done little to assist in the children's relationship with their father and has succeeded in alienating the affections of the two eldest toward him. We believe the record supports a finding that it is in their best interest to remain in the custody of Wife. As to the two youngest children, the record does not lend itself to the conclusion that Wife would foster or facilitate any healthy relationship between them and their father. Husband presented testimony that he could adequately attend to the needs of these children, make arrangements for their travel to and from school and provide a comfortable, if somewhat modest, living environment. The record does not indicate that the two youngest children willingly chose to cease visitation with their father. Conversely, it reflects that they enjoyed visiting with him, especially participating in the church activities and that, most importantly, Husband very much wants a relationship with them. Therefore, it is the finding of this Court that their custody was properly awarded to Husband so that they can better come to know, love and respect both their parents.

As to the issues regarding property distribution, Husband first asserts that the trial court's classification of the $24,000, used as a portion of the down payment on the marital home, as Wife's separate property was error. He contends that this property became marital pursuant to the doctrine of transmutation. The court in ***McClellan v. McClellan***, 873 S.W.2d 350 (Tenn. App.

1993), defines the doctrine as follows:

> [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. One method of causing transmutation is to purchase property with separate funds but to take title in joint tenancy. This may also be done by placing separate property in the names of both spouses. The rationale underlying both these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital statutes that property acquired during the marriage is presumed marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.
>
> 2 H. Clark, *The Law of Domestic Relations in the United States* § 16.2, at 185 (1987).

*McClellan*, 873 S.W.2d at 351 (quoting *Batson v. Batson*, 769 S.W.2d 849, 858 (Tenn. App. 1988)).

Husband argues that while he acknowledged at trial that the $24,000 came from Wife's separate funds, he did not testify "that the parties had agreed eight years ago that the down-payment would remain separate." Husband's testimony on this issue reflects the following:

> A    She had the intent she stated of keeping that property separate from me.
>
> Q    All right. Because it has relevance under the rules we've talked about, I'll just ask you specifically, did you agree with your wife that that $24,000 from her inheritance would be considered a part of her separate property?
>
> A    Yes, I agreed to that.
>
> Q    Did you have any such agreement with regard to the $16,000 or so equity out of the house you sold?
>
> A    No.

We conclude that the record supports the trial court's finding that the $24,000 remained Wife's separate property.

Husband next questions whether the trial court erred in ordering him to repay Wife funds she withdrew from her separate account to pay joint marital obligations in an amount totaling $19,000. He admitted suggesting that she use her inheritance as a loan to them to pay off such debt

but testified that the actual amount used from her separate funds was $10,000. Wife, on the other hand, testified that the amount she had contributed from her separate funds was $19,000 to $20,000. She further testified:

> THE COURT: Is it your testimony that any time you paid a bill, family bill, with that money you had an agreement with your husband that you would be reimbursed for that?
>
> THE WITNESS: That's basically what the agreement was, that I would handle making these payments to get our financial shape back so that we would not be paying so much interest.
>
> THE COURT: So you expected not to use any of your personal funds for family affairs.
>
> THE WITNESS: No, sir.

Wife also presented various checks representing such "loans" and stated that "[o]thers were direct transfers from my account to the joint account and some were overdraft protection ones." Based on the evidence presented, we cannot say that it preponderates against the trial court's finding in this regard.

Finally, Husband argues that the trial court erred in its total division of marital assets and debt. He takes issue with the fact that he never received his determined equity in the marital home or the horses. It is quite clear from review of the record that his equity in these assets was considered in reducing his debt to Wife ($24,000 separate property regarding purchase of marital home and $19,000 for payment of other marital obligations). Husband further questions the trial court's award to Wife of an additional $15,200 and contends that it was an "apparent miscalculation." We must agree on this point as we are unable to discern from the record why Husband is indebted to Wife for this additional amount. We, therefore, modify the trial court's judgment to the extent that it obligates Husband to repay these funds.

We further find no merit in Wife's contention that the trial court incorrectly valued the horses or treated the increase in value as marital property. Wife testified that she originally purchased four horses for $17,750 and had bred ten on the farm. One horse purchased for $1,250 died. Husband testified that the horses had a present value of $52,000. Husband also testified that,

while Wife was primarily responsible for caring for the horses, he did the majority of fence repair and other general repairs as needed, built an addition to the barn and drove the horses to various shows. The valuation of an asset is a question of fact and the trial court's valuation is presumed correct on appeal. *Smith v. Smith*, 912 S.W.2d 155, 157 (Tenn. App. 1995).

We decline to award Wife her attorney's fees incurred in this appeal. It results that the judgment of the trial court is affirmed, as modified, and this cause remanded for any further necessary proceedings. Costs are assessed equally against the parties.

 

_____
FARMER, J.

 

_____
HIGHERS, J. (Concurs)

 

_____
TOMLIN, Sr. J. (Concurs)