Cynthia MUSSELMAN (Tinlin),
Plaintiff–Appellant,

v.

James Ritter ACUFF,
Defendant/Appellee.

Court of Appeals of Tennessee,
Eastern Section.

Nov. 1, 1991.

Permission to Appeal Denied by
Supreme Court March 16, 1992.

James D. Causey, Memphis, for plaintiff-appellant.

John D. Lockridge, Lockridge & Becker, P.C., Knoxville, for defendant-appellee.

## OPINION

FRANKS, Judge.

In this post-divorce action, the Trial Judge ordered the custody of the parties' child changed from the mother to the father. The mother has appealed. We reverse.

### CIRCUMSTANCES AT THE TIME OF THE DIVORCE AND SUBSEQUENT CHILD SUPPORT MODIFICATION

Cynthia Musselman (Tinlin) divorced James Ritter Acuff on August 27, 1982.

Acuff's temper played a prominent role in the divorce, and the final decree permanently enjoined him from "molesting" his former wife. The Court awarded custody of the infant son, Shane, to his mother, then a student at the University of Tennessee, and ordered child support of $35 a week from the father, then a self-employed carpenter. On March 12, 1985, a Maryland court modified the father's support obligation, by raising it to $235 a month.

## CIRCUMSTANCES OF THE CUSTODIAL MOTHER AND CHILD SINCE THE DIVORCE

In 1983 Musselman graduated from the University of Tennessee with a degree in electrical engineering, and was hired by IBM to work in Maryland, where she has extended family. She, along with her son, lived in Maryland for approximately two years. During that time she had a sexual relationship with one Allen Voss who sometimes stayed overnight at her home. Not until her employer increased her job-related travel, did she consider leaving Maryland. But when her work required her to spend increasing amounts of time away from her young son, she sought a location transfer. Her employer honored the request by moving her and Shane to California in 1985. They lived in temporary housing until Musselman could find an apartment. Soon thereafter, she placed Shane in a nearby private day-care program. Rents were higher in California, and Shane's father proved very unreliable in making child support payments. To make ends meet, Musselman shared the apartment with one Steve Hout. For about six months they were friends, but over the extended period they became lovers, and planned to marry. Then a series of personal problems unrelated to this case beset Hout, and in a fit of temper he forcibly cut off some of Musselman's hair. She immediately terminated their relationship and forced Hout to vacate the apartment. In January 1988 she sought counseling for Shane and herself to resolve this difficult episode. The counseling lasted approximately six months, and that year Shane entered kindergarten and did well.

When Musselman was apprised that her rent would be increased, and taking into account that her son would then enter the first grade, she moved, after investigating local schools, and choosing an area where the school had high academic ratings. Her new apartment was shared with an older male to defray expenses, but this relationship was platonic.

In May of 1988, she met her current husband, Kyle Tinlin, who lived in the vicinity of her apartment complex. He moved into the apartment in the fall of 1988. Tinlin, employed by Digital Corporation, was transferred to Albuquerque, New Mexico, and asked Musselman to marry him. She then arranged for a second IBM transfer, and they moved in May of 1989 and were married in July of 1989.

In New Mexico the Tinlins purchased a house, and their combined incomes are approximately $75,000 a year. Their home is near Mrs. Tinlin's office, and Shane is provided a comfortable life that includes a suburban home, neighborhood playmates, a good school and team sports. He was enrolled in an after school day-care program to bridge the time until the Tinlins come home from work. Shane has been an A and B student, and his child supervisor testified that he appeared bright, normal, healthy, and fond of his stepfather.

The parties stipulated that Shane wanted to live with his mother and stepfather.

## CIRCUMSTANCES OF THE NON–CUSTODIAL FATHER SINCE THE DIVORCE

James Acuff was self-employed at the time of the divorce, but now owns and operates a beauty shop with his fourth wife. Together they gross about $26,000 per year. The father has been in arrears in child support for years. At times he paid a fraction of his obligation, but for twelve out of the sixty months preceding the cus-

tody trial, he had paid nothing. The parties stipulated to $9,342 arrearage, and despite his professed inability to make payments, he maintained mortgage payments on his business, made substantial monthly payments on two automobiles, and placed one child in a private school. He also made generous tithes to various religious organizations. He also has a fourteen-year-old daughter from a prior marriage, whom he has not seen in years, and for whom he pays no child support. At the time of the hearing, three children were living with the Acuffs from their prior and current marriages.

Acuff has a history of drug and alcohol abuse, for which he never received professional treatment.

The mother sued for contempt and back child support on October 10, 1989. In response, the father petitioned for a change of custody. During the action the child support referee determined Acuff to be in contempt for failure to obey the order of the Maryland court. He ordered payments of $235 per month support, plus $100 per month toward the arrearage. The Chancellor changed custody and ordered the mother to pay $500 a month for Shane's support, less $100 a month credit for the arrearage, and she was also ordered to pay legal fees for Acuff.

The basis for the Trial Court's decision to change custody is set forth in his Memorandum of Opinion. He observed:

"Although in recent years there may have been some change in the public view of unmarried persons of the opposite sex living together, the Court is not aware of any teaching that continuous exposure of a child to a succession of unmarried lovers by a parent of the child who sleeps with them in the family home is proper for a child's development. Such conduct as occurred here has not been in the best interest of the child."

He continued:

"The fact that Plaintiff has married Mr. Tinlin, her most recent lover, might be favorable to her cause. However, Mr. Tinlin has not appeared, and has not testified, leaving the evidentiary view of him that alone testified to by Plaintiff. His failure to testify weighs heavily against Plaintiff."

 The scope of review in custody cases is de novo upon the record accompanied by a presumption of correctness, unless the preponderance of evidence is otherwise. *Hass v. Knighton,* 676 S.W.2d 554 (Tenn.1984). The paramount consideration in a custody proceeding is the best interest of the child. When the issue before the Court is whether to modify a prior custody order, it need not repeat the comparative fitness analysis that is appropriate at the time of the original custody degree. *See e.g., Bah v. Bah,* 668 S.W.2d 663 (Tenn. App.1983). Instead, in a modification proceeding, the trial judge must find a material change in circumstances that is compelling enough to warrant the dramatic remedy of changed custody. *See,* Tenn. Code Ann. § 36–6–101(a); *Woodard v. Woodard,* 783 S.W.2d 188 (Tenn.App.1989); *Dailey v. Dailey,* 635 S.W.2d 391 (Tenn.App.1981). Moreover, the burden is on the non-custodial parent to prove changed circumstances.

Generally, when courts consider the issue of a custodial mother's cohabitation, the view is adopted that it is but one factor to consider in determining what custodial arrangement is in the child's best interest. *See e.g., Monsour v. Monsour,* 347 So.2d 203 (La.1977); *Draper v. Draper,* 382 A.2d 1095 (Md.App.1978).

When a relationship has resulted in marriage, courts frequently hold a change of custody is inappropriate, the explanation being that the acts are remote in time and are no longer occurring. *See Gould v. Gould,* 55 Ala.App. 379, 316 So.2d 210 (1975); *Pea v. Pea,* 498 N.E.2d 110 (Ind. App.1986); *Monsour, Durbin v. Durbin,* 573 S.W.2d 146 (Mo.App.1978); *Winn v. Winn,* 190 Mont. 73, 618 P.2d 870 at 871 (1980). The same result is generally reached by the Court when the cohabitation has terminated. *See Saloga v. Saloga,* 96

Ill.App.3d 661, 52 Ill.Dec. 128, 421 N.E.2d 991 (1981); *Ehr v. Ehr,* 77 Ill.App.3d 540, 33 Ill.Dec. 11, 396 N.E.2d 87, (1979); *Fletcher v. Fletcher,* 170 So.2d 144 (La. App.1964); *McClarnon v. McClarnon,* 528 S.W.2d 795 (Mo.App.1975). More important, whether the mother marries, in virtually all cases that have considered similar circumstances the courts stress that the sexual behavior of the mother is not a ground for change of custody absent a showing that the behavior had an adverse impact on the child's welfare. *See Gould, Saloga, Ehr, Pea, Monsour, Fletcher, Draper, Ballard v. Ballard,* 434 So.2d 1357 (Miss.1983) (*Durbin, Winn,* and *McDonald v. McDonald,* 94 A.D.2d 856, 463 N.Y.S.2d 598 (1983)). *Accord Mimms v. Mimms,* 780 S.W.2d 739 at 745 (Tenn.App. 1989) (observing that a parent's sexual conduct does not *ipso facto* disqualify a parent from custody).[1]

■ In this case, the record establishes a consistent pattern of the mother's caring for her child. She obtained an injunction to protect herself and the child from the father's rages at the time of the divorce, enrolled Shane in high quality day care and in good public schools. At least three of her moves, which the Trial Judge criticized, were prompted by concern for her son's need: the move from Tennessee to Maryland, in part, to separate from her ex-husband's violence; the move from Maryland to California to reduce her out-of-town travel; and the move to a new apartment was to improve Shane's schooling. The family crisis that ensued when Hout left was met by counseling. The mother attempted, albeit unsuccessfully, to enforce the father's child support obligation in the face of his threats of the loss of her son if she attempted to collect the support. During this bitter custody dispute, she testified she encouraged Shane to call his father, and would encourage changing visitation to allow Shane to spend uninterrupted holiday periods with his father.

There is some evidence that the mother inappropriately bartered visitation for an arrearage payment on one occasion, and that Shane had been loosely supervised at play at infrequent intervals. However, the record fails to show any pattern of neglect or abuse that would support a custody change. The parties admit that Shane wants to live with his mother, the only parent he has ever really known, and the evidence clearly preponderates that the child has not been adversely impacted by being in his mother's care and custody. He has made good grades in school, and a day-care worker found him to be a normal, well-adjusted child, with a satisfactory relationship with his new step-father.

■ The step-father's failure to testify, in light of the entire record, afforded no basis to change custody. On this issue the Trial Judge relied upon *Riddick v. Riddick,* 497 S.W.2d 740 (Tenn.App.1973) overruled in part, 676 S.W.2d 554 (Tenn.1984). In that case, the non-custodial mother sought to modify a parent custody order upon her remarriage. The Court noted that her failure to produce the new husband as a witness was detrimental to her cause, but in the instant case, the mother was the custodial parent, and the burden to prove a change in circumstances was on the father, while the Trial Judge in effect cast the burden upon the mother.

We reverse the judgment of the Trial Court on the issue of custody, since the evidence preponderates against his finding, T.R.A.P. Rule 13(d), and echo the words of the Mississippi Supreme Court in a case with similar facts, where the trial court had removed a nine-year-old boy from a mother who had cohabited with a lover. The court observed:

> "Furthermore, it was manifest error to hold that the facts and circumstances of this case supported a modification of this child's custody. It must be recognized

---

1. We also have held that cohabitation by a custodial mother, alone, is not a sufficient change of circumstances to disturb the custodial arrangement. *Smith v. Smith,* 1987 WL 17407 (Tenn.App.)

that uprooting a child from his mother, school and environment was a jolting, traumatic experience. It is only that behavior of a parent which clearly posits or causes danger to the mental or emotional well-being of a child (whether such behavior is immoral or not), which is sufficient basis to seriously consider the drastic legal action of changing custody. This case not not remotely reach any such proportion."

*Ballard*, 434 So.2d at 1360.

The referee's order that requires the father to pay $235 per month in child support, plus $100 toward the arrearage is the order of this Court. The father is not entitled to any credit toward the arrearage, and the mother is not entitled to any refund of support during any time the child may have been in custody of the father. The order to pay the father's attorney fees is reversed, and the costs of appeal are assessed against the Appellee. The cause is remanded to the Trial Court for the entry of a judgment consistent with this opinion.

McMURRAY, J., and GARY R. WADE, Special Judge, concur.