# IN THE COURT OF APPEALS OF TENNESSEE, WESTERN SECTION
## AT NASHVILLE
_____

|  |  |  |
|---|---|---|
| **SHERYL LYNNE HOOKE (THOMPSON),** | ) | Davidson Circuit Court |
|  | ) | No. 93D-3447 |
| Plaintiff/Appellee, | ) |  |
|  | ) |  |
| VS. | ) | App. No. 01A01-9504-CV-00180 |
|  | ) |  |
| **ALAN RICHARD THOMPSON,** | ) |  |
|  | ) |  |
| Defendant/Appellant. | ) |  |
|  | ) |  |

**FILED**

**Oct. 4, 1995**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

From the Circuit Court of Davidson County at Nashville.
**Honorable Marietta Shipley, Judge**

**A. Russell Willis**,
WILLIS & KNIGHT, Nashville, Tennessee
Attorney for  Defendant/Appellant.

**Rosemary E. Phillips**,
BUTLER & PHILLIPS, Nashville, Tennessee
Attorney for Plaintiff/Appellee.

OPINION FILED:

**AFFIRMED**

**FARMER, J.**

**CRAWFORD, J.**: (Concurs)
**HIGHERS, J.** : (Concurs)

This matter concerns the custody of Wayne Nicholas Thompson, II, the minor son of Appellee, Sheryl Lynne Hooke (Thompson) ("Mother") and Appellant, Alan Richard Thompson ("Father"). Both parties sought custody pursuant to separate petitions for divorce.[1] The final divorce decree awarded custody to Mother, but stated that Father was to have physical possession of the child during the time period in which Mother underwent treatment for alcoholism. The decree provided that upon Mother's completion of a treatment program, physical possession of Nicholas would revert immediately to her. Father has appealed from the trial court's judgment, challenging both the custody award and the trial court's denial of his request to discover Mother's psychiatric records. For reasons hereinafter expressed, we affirm the judgment.

The parties married in Tampa, Florida in March 1989 and moved to Nashville shortly thereafter. Nicholas was born in October 1989 and was 5 years old at the time of trial.

Much of the testimony centered around the allegations of Mother's abuse of alcohol and Father's financial instability. Mother admitted to a family history of alcoholism. She further admitted to consuming alcohol and smoking marijuana while Nicholas was in her custody. She testified that she had never been diagnosed as an alcoholic or received treatment for the disease. She stated that she no longer smokes marijuana or uses any kind of illegal drugs. On direct examination, she denied having an alcohol problem, but asserted that if it was determined that she did and that treatment was needed, she would undergo it in order to maintain custody of Nicholas. She stated, "[i]f I have a problem with alcohol, I will go and get treatment . . . . I mean that sincerely." She agreed to abide by any judicial restrictions placed on her, regarding her alcohol consumption, to keep Nicholas.

Mother testified that she received treatment from Dr. Kenner, a psychiatrist, concerning "family issues." These issues included problems in her relationship with her own mother, an alcoholic. Mother stated, "[t]here are issues that I would like to resolve in my life so I can have a happy relationship, so I go to Dr. Kenner to take care of these issues." She ceased treatment with

---

[1]Mother initially filed for divorce in September 1993. After a failed attempt at reconciliation, Mother filed an amended complaint in November 1994. Mother was granted temporary custody pending a final hearing.

Kenner in September 1994. She testified that she underwent a medical evaluation by Dr. Murray Smith at the request of Husband's counsel.

Mother professed to being the primary caretaker of Nicholas during the marriage, stating that she reads to him at night and comforts him when he calls out for her. She takes him to the doctor and dentist and picks him up from school. She makes certain that he participates in school activities, including soccer. She assists in planning his birthday parties and takes him to the movies and the park. She bought his first and second bicycle and cuts his hair. She related, "[h]e goes everywhere with me almost. . . . He's just attached to me." Mother realizes that Nicholas' father is important to him and would never deny Nicholas access to him. She stated that Nicholas "loves his daddy."

The record indicates that Father held various employment positions during the marriage. He testified to a prior cocaine addiction resulting in financial problems and damage to his professional reputation. He confirmed that money was a constant problem in the marriage and that he was "personally heavy in debt." He related that his move to Miami was in an attempt to make enough money to satisfy an IRS debt. He described Mother as an alcoholic whose emotional instability had led to "explosive" temper tantrums. He stated that she suffered from these problems prior to his move to Miami, but that their relationship and her drinking problem had improved at the time. Father testified that Mother ceased drinking alcohol altogether for a period of 7 months in 1991.

The parties' attempted reconciliation occurred between January and August 1994. During this time, Father stated that he was responsible for getting Nicholas ready for school and preparing his breakfast and lunch. Mother picked him up after school and Father spent the evenings with him after returning home from work at around 9:30 p.m. Saturdays were spent together as a family, but Mother's alcoholism disrupted some of their plans. Father testified that when he arrived home from work, Mother was "already tipsy or intoxicated almost every single night." Consequently, Mother missing planned activities with her son. Father stated that he also consumed alcohol almost every night after returning home from work.

Father admitted Mother's love for her son, but believes himself more compassionate and affectionate toward Nicholas. He also believes he offers his son more stability. Father testified that it was in his son's best interest to have his mother get "psychiatric treatment with an addiction specialist." Father believes the appellee would be a good mother if she successfully completed this treatment. He acknowledged that if she were not abusing alcohol and smoking marijuana, "[w]e wouldn't be here today."

Father expressed a desire to move with Nicholas to Atlanta if awarded custody. At the time of trial, Father was employed and earning $800 per week. His move to Atlanta, to operate a gasoline station, would result in an initial decrease in salary and residency with his father and stepmother. Father testified that he would forego the move if necessary for him to attain custody.

Mother has worked as a legal secretary since the couple's initial move to Nashville. One of the attorneys for whom she works testified that Mother had been her secretary for 2 years and that she experienced no problems with her work performance or attendance during this time.

Dr. Murray Smith, an internist and addictionologist, testified that he is the medical director at the Baptist Hospital drug and alcohol treatment center. His duties include interviewing individuals to determine whether they meet specific criteria establishing them as chemically dependent. The interview process consists of a 5 step inquiry to determine the patient's genetic history, whether the patient has become too preoccupied with the chemical, whether there has been a loss of control, whether they have continued their behavior despite problems resulting from the abuse and finally, whether the patient exhibits denial.

Dr. Smith testified that Mother's examination included her account of a family history involving alcoholism and the fact that she had been physically and emotionally abused by her own mother. Mother informed Smith that she had previously received psychiatric treatment for this abuse. Mother also informed him that she continued to drink while receiving this treatment and that she had not been without alcohol for an entire month since 1992.

Based upon this as well as other information provided, Smith diagnosed Mother an

alcoholic. He related that she was in the "middle stage" of the disease, which entails a regular use and "getting into trouble." Smith would recommend Mother as a candidate for a substance abuse treatment program as he "found her to be a very cooperative, intelligent lady." He continued, "I believe that an intervention on somebody at her stage, based on the fact that she needs to see the pain that is happening in her life, that the alcohol is too important to her, I believe she could be a good candidate for an intervention and treatment." Smith stated that the typical alcoholic seeks treatment after experiencing some "problem in their life that they [cannot] deny" and that the "most powerful" tools for getting alcoholics to receive help are their children.

Smith concluded that Mother should never drink alcohol and suggested a six-week outpatient program consisting of 24 sessions to learn "how to be happy without alcohol and drugs." He perceived Mother's chances of completing treatment and never drinking again at 80%. Smith further stated that for the treatment to be successful, the patient, at some point during the process, has to admit to a problem. A discharge from the program means that the patient completed the program and has accepted a process of living that allows them to be happy, free from drugs and alcohol. Smith stated that because the disease of alcoholism is viewed as progressive and fatal, it must be held in remission after completion of the program by "continuing AA meetings, sponsorship, reading, meditation, a whole process of how to take care of yourself."

Dr. Smith also expressed concern regarding Father's drinking habits. He stated that most importantly for the child is that both parents be sober, for that is the only way the child is safe.

At the conclusion of Dr. Smith's testimony, Mother, on redirect examination, admitted to having an alcohol problem and declared that she would seek treatment. When asked, "[i]s it important enough to you to have custody of Nicholas that you will do whatever program the Court recommends?", Mother responded, "[y]es."

Based upon the foregoing, the trial court awarded Mother custody, but ordered that she begin receiving treatment for alcoholism "as soon as possible." Father was ordered to stay in Nashville for "at least the next 6 to 9 months" as he was to have physical possession of Nicholas during the time period of Mother's treatment. If and when Mother completed the program and

presented documentation to the court for verification, physical possession was to revert "immediately back" to her. Visitation was provided for Mother during the time period for which she was undergoing treatment and for Father thereafter. If Mother failed to complete the program, Father was to retain physical possession for the following 6 months or until such time when Mother successfully completed the program. The court also ordered Father to undergo an evaluation, and treatment if believed necessary. He was to provide proof of completion of any prescribed treatment. Both parties were permanently prohibited from using alcohol and drugs while the child is in their physical possession.

Father states the issues on appeal as follows:

> 1. Whether the trial court erred when it awarded future custody of the minor child to Wife conditioned upon her completing outpatient treatment for alcoholism.

> 2. Whether the trial court erred in denying Husband discovery of the psychiatric records of the Wife.

In addressing Father's first issue, we note that the record includes a certificate of achievement awarded to Mother on December 29, 1994 for successful completion of the six-week treatment program ordered by the trial court. Despite completion of the program, Father argues that the trial court was in error in assuming that even upon completion of such program Mother would be drug and alcohol free forever and committed to sobriety. He asserts that Mother has completed only the first step of a long recovery process and that there is no guarantee that she will succeed in her recovery. Father also raises the point that Mother only admitted to having a problem after the testimony at trial was such that she could no longer deny it. Father states, in his brief, "[t]he best interests of Nicholas are not served by playing the odds and hoping for the best as the trial court seems to have done."

The scope of our review of a child custody decision is *de novo* upon the record accompanied by a presumption of correctness, unless the evidence preponderates otherwise. *E.g., Musselman v. Acuff*, 826 S.W.2d 920, 922 (Tenn. App. 1991). The trial court, in its final decree, expressly found both parties credible and that both are fit and proper parents to have custody of their

son. The court was impressed with the fact that no evidence was presented to show that the child was exhibiting any problems as a result of those of his parents. The court commended Father for a successful recovery from drug addiction and for bringing his wife's substance abuse problem to the court's attention. The court found Mother to be the primary caretaker of Nicholas, but found that both parents had contributed to his well being. The court also recognized that, during the time period when the parties were separated, both Mother and child "did very well." The court found that Wife's employment had not been affected and that she had "gotten through the stresses which come both from work and with the stresses of the divorce which exacerbate problems in a very commendable fashion." The court found central to the case the issue of Mother's abuse of alcohol and significant the fact that Father testified that but for his wife's alcohol problem, he would not have filed for custody. Lastly, the court viewed the trial testimony as the "intervention" necessary for Mother to realize her problem.

In making a custody decision, we are ever mindful of the fact that the best interests of the child are paramount. *See Musselman*, 826 S.W.2d at 922. Based upon the record before us, we cannot say that the evidence preponderates against the trial court's findings. Mother has been the primary caretaker of this child and, from all indications, the two have never been separated, except for the six-week period of Mother's treatment. Although Father has questioned mother's sincerity regarding her continued commitment to sobriety, the trial judge found her testimony credible. Her successful completion of the outpatient program lends further credence to her expressed commitment.

It is imperative, however, to impress upon both parties the realization that any custody arrangement is subject to modification upon a showing of a material change in circumstances. *Hill v. Robbins*, 859 S.W.2d 355, 356 (Tenn. App. 1993); *Musselman*, 826 S.W.2d at 922. "Changed circumstances" constitutes any material change of circumstances affecting the welfare of the child including new facts or changed conditions not anticipated in the former decree. *Dalton v. Dalton*, 858 S.W.2d 324, 326 (Tenn. App. 1993). Consequently, either party's failure to abide by the trial court's order regarding their prohibited use of alcohol and drugs while in possession of the child may result in either a change in custody or neither parent receiving custody.

Father also takes issue with the trial court's refusal to allow discovery of Mother's psychiatric records maintained by Dr. Kenner. Father argues that he was entitled to discover this information and present the relevant portions into evidence at trial. He relies specifically upon T.C.A. § 24-1-207(a)(1) which reads:

> **Communications between psychiatrist and patient.** -- (a) Communications between a patient and a licensed physician when practicing as a psychiatrist in the course of and in connection with a therapeutic counseling relationship regardless of whether the therapy is individual, joint, or group, are privileged in proceedings before judicial and quasi-judicial tribunals. Neither the psychiatrist nor any member of the staff may testify or be compelled to testify as to such communications or otherwise reveal them in such proceedings without consent of the patient except:
>
> (1) In proceedings in which the patient raises the issue of the patient's mental or emotional condition;

Father contends that Mother placed her mental and emotional condition in issue when seeking custody of Nicholas and that her communications with Dr. Kenner, therefore, fall within the exception. Upon review of the record, however, we conclude that any error by the trial court in denying discovery of Mother's psychiatric records and thus, precluding any testimony thereto, was harmless. Mother was interviewed by Dr. Murray Smith, a psychiatrist chosen by Father. Dr. Smith diagnosed her an alcoholic and testified at trial. Furthermore, Mother testified as to her reasons for seeking treatment from Dr. Kenner. We conclude that overall a proper resolution of this matter was made by the trial court without resorting to the disclosure of this information.

It results that the judgment of the trial court is affirmed. Costs are taxed to Alan Richard Thompson, for which execution may issue if necessary.

_____
FARMER, J.


_____
CRAWFORD, J. (Concurs)


_____
HIGHERS, J. (Concurs)