# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

# ALMA D. MURRAY v. MARK K. MURRAY

**Appeal from the Chancery Court for Williamson County**
**No. 24564R1      Russ Heldman, Chancellor**

---

**No. M1999-02081-COA-R3-CV - Decided June 27, 2000**

---

Following divorce, the court granted joint custody of the two children of the marriage to both parents, with the mother receiving primary physical custody. After problems arose with the joint custody arrangement, the parents both filed petitions to modify the divorce decree. The trial court responded by dividing custody equally between the parties. We reverse, and grant custody to the father, with reasonable visitation for the mother.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed and Remanded**

CANTRELL, P.J., M.S., delivered the opinion of the court, in which KOCH and CAIN, JJ. joined.

Clark Lee Shaw, Nashville, Tennessee, for the appellant, Alma D. Murray

P. Edward Schell, Franklin, Tennessee, for the appellee, Mark K. Murray

## OPINION

### I.

Mark and Alma Murray married, divorced, and married again. Their son, Clint, was born in July of 1986. Their son, Mark Jr., was born in June of 1988. A final decree of divorce, filed on December 16, 1997, ended their second marriage. The court's order gave effect to the parties' marital dissolution agreement, which gave the parents joint custody of their two boys, with the mother to exercise primary physical custody. The father was ordered to pay child support.

Despite continuing tensions between the parties, they managed to cooperate reasonably well on matters of visitation and support. The parties had full-time jobs with different hours, and they had to alternate care of the children in a way that would not interfere with their job responsibilities. Mr. Murray always paid his child support on time, and he gave Ms. Murray additional financial help when she needed to move into a new apartment.

The situation changed in June of 1998 when Alma Murray began dating Patrick Neiswinter. Mr. Murray strongly objected to the fact that his former wife allowed Mr. Neiswinter to spend nights in her apartment when the children were present. For her part, Alma Murray no longer felt that she had to rely on Mark Murray for help with child care, and she stopped communicating with him about the children, and became less cooperative on matters of visitation. For example, she and Mr. Neiswinter took the boys on a camping trip in Virginia over the Labor Day weekend without telling Mr. Murray, and this apparently reduced his scheduled visitation.

On September 16, 1998, Mark Murray filed a Petition to Modify the final decree of divorce. He contended that it was not in the best interest of the children to be exposed to immoral behavior by the mother, and he asked the court to order her to "cease having men she is not married to spending the night at her home in the presence of the children or, in the alternative, that the children not be forced to spend the night in the home of their mother's boyfriend or any other man."

On December 18, Alma Murray filed an answer and counterclaim. The answer admitted that she "allowed one man, who she has a steady serious relationship with, sleep on the downstairs couch in her residence," but denied the allegations of immoral conduct. The counterclaim asked the court to award her 50% of the proceeds from the husband's sale of a piece of property in Georgia, where the parties had previously lived.[1]

On February 18, 1999, Mark Murray filed an amended petition, in which he asked to be granted primary custody of the children. Mr. Murray alleged that he had asked both Ms. Murray and Mr. Neiswinter to discontinue the overnight visits while the children were in the house, and that they had agreed, but had not kept the agreement. Instead, they continued to live together on a nearly full-time basis in Ms. Murray's house. Mark Murray also claimed that Alma Murray had repeatedly interfered with his right to get information from the children's school, that she had allowed them to accumulate frequent and excessive absences from school, that she maintained a dirty or messy house that was not a suitable environment for the children, and that she was financially irresponsible.

The hearing of this case was conducted on May 12, 1999. During her testimony, Alma Murray admitted to her sexual relationship with Patrick Neiswinter, and referred to him as her fiance. At the conclusion of testimony, the trial court took the case under advisement for 30 days, and implied that if Ms. Murray and Mr. Neiswinter married during those 30 days instead of waiting until a planned wedding date of October 2, he would be more sympathetic to her arguments.

Alma Murray married Patrick Neiswinter on May 28, 1999, and filed proof of the marriage with the court. On July 6, 1999, the trial court entered an order giving the parties what it termed "divided custody" of the children, but which appears to be just another form of joint custody. By the terms of the order, Mark Murray would have sole care and custody of the children during the fall school term, and Alma Murray Neiswinter would have the same custody during the spring term. The

---

[1]Mrs. Murray did not press her counterclaim, and it forms no part of the final order of the trial court.

summer months would be equally divided between the parties. Each party would pay child support to the other during the other party's period of custody, and would be entitled to specified visitation during that period. An amended order, filed July 28, 1999, included more specific detail regarding schooling and visitation. Both parties appealed.

## II.

The parties are equally unhappy with the decision of the trial court, and both agree that joint custody is not in the best interest of the children. Interestingly, the trial judge himself stated at the conclusion of the May 12 hearing that "there is no way that joint custody is going to continue to work in this case. I don't think it ever really operated or worked," and "joint custody is an onerous burdensome method of raising children between divorced people. It rarely really works."

It is unclear why the trial judge chose, despite his own grave reservations, to order a joint custody arrangement in this case. Perhaps he ruled as he did because of the difficulty of choosing one parent over another, when both parties appear from the record to be loving, concerned parents, who are obviously eager to do their best for the children.

In any case, the parties appear to be in agreement that it would be in the best interest of the children for the court to grant custody to only one parent. Of course they disagree as to which of them is the more suitable parent to exercise that custody.

Before dealing with that difficult question, however, we must first dispose of a threshold matter raised by Ms. Murray. She argues that it was error as a matter of law for the court to remove the children from her primary custody, in the absence of proof that her behavior poses a risk of danger to their mental or emotional well-being. She relies for this argument upon the case of *Musselman v. Acuff*, 826 S.W.2d 920 (Tenn. Ct. App. 1991), in which this court used just such language in reversing a trial court's change of custody. We also held that the cohabitation of a parent with a person of the opposite sex does not, in and of itself, constitute a change of circumstances that would justify a change of custody.

We note that the custody statute, Tenn. Code. Ann. § 36-6-101, merely states in reference to modification of an order of custody and child support that "[s]uch decree shall remain within the control of the court and be subject to such changes or modifications as the exigencies of the case may require."

Our courts have interpreted the term "exigencies" in that section to refer to new facts or changed conditions which emerged after the initial custody order, and which could not have been anticipated by it. *Smith v. Haase*, 521 S.W.2d 49 (Tenn. 1975). Such changes in circumstances may include "the unworkability of joint custody because of the recalcitrance of one or both parents." *Dalton v. Dalton*, 858 S.W.2d 324, 326 (Tenn. Ct. App. 1993). *See also Dodd v. Dodd*, 737 S.W.2d 286 (Tenn. Ct. App. 1987).

The *Musselman* case can easily be distinguished from the present one by its unusual facts. In that case, the trial court terminated the sole custody that a mother had exercised over her son since he was an infant, and placed it in a father who had a history of untreated alcohol and drug abuse. The mother had remarried, and lived in New Mexico. The father, likewise remarried, apparently lived in Tennessee. The trial court's decision was based primarily upon the fact that the mother had become involved in sexual relationships with several men before getting married. This court appropriately reversed the trial court, finding nothing in the mother's conduct to justify the drastic remedy ordered by the trial court.

In the present case, both parents participated in bringing up their children both before and after the divorce. The father lives in Franklin, and the mother in Brentwood, so even with custody granted to one or the other, reasonable visitation will ensure that both will have a continuing role to play in their children's lives. It is apparent that a change of custody in this case need not have the drastic effect on the children that could have resulted from the trial court's order in the *Musselman* case.

It should be self-evident that it would be unwise for the courts to alter child custody orders because of minor changes in the lives of the custodians or children, even if those changes were unanticipated by the decree, or else every new circumstance would be an occasion for renewal of the struggle over custody. But we believe that the failure of joint custody in this case is not a small matter, and that it provides ample reason for crafting a different arrangement.

### III.

The paramount consideration in child custody cases is always the best interest of the child or children. *Bah v. Bah*, 668 S.W.2d 663 (Tenn. Ct. App. 1983). In cases in which the children are fortunate enough to have two capable and fit parents ready to assume custody, the job of the court is to weigh the comparative fitness of the parents, and choose the one best able to meet the children's needs.

The legislature has set out a list of factors for the courts to consider in determining the best interest of the child. Tenn. Code. Ann. § 36-6-106. These include,

(1) The love, affection and emotional ties existing between the parents and child;
(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;
(4) The stability of the family unit of the parents;
(5) The mental and physical health of the parents;

-4-

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child.

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

The proof shows that both parties are able to offer their children a generous amount of love and affection, and that both are equally disposed to furnish their children with food, clothing, medical care, education and other necessities of life. We believe, however, that course of events following the divorce demonstrates that the father is in a better position to offer them the continuity and consistency that they require.

After the parties separated, the children continued to live with their mother in the Franklin apartment the parents had shared as a couple. Mr. Murray moved temporarily into a Brentwood apartment with a man who belonged to his church. Later, the mother fell behind in her rent. She moved out of her apartment without paying the rent, and after a move to Robertson County did not work out, she called upon Mr. Murray to help her move back to Williamson County. They found a duplex, and Mr. Murray paid the first month's rent in addition to his regular monthly child support payment.

Meanwhile, Mr. Murray's father moved to Tennessee, and he and Mr. Murray bought a new home in a Franklin subdivision, in close proximity to a neighborhood school. Larry Murray is retired, and while he did not testify at trial, it was clear from the mother's testimony that she regards him as a reasonable man who loves his grandchildren, and who can be trusted to take care of them when Mark Murray is unavailable.

The mother obviously has a problem handling money and meeting all the commitments involved in running a household. The apartment complex in which she had lived sued her for failure to pay the rent, and obtained a $2,000 judgment. Williamson County Medical Center also obtained a judgment against her. Her drivers license was suspended because of unpaid traffic citations, and for failure to pay damages from a 1997 accident. Since then, she had been driving around with a suspended license. On one occasion, the electricity in her apartment was turned off for non-payment of the bill. Interestingly, Patrick Neiswinter admitted that he has also had financial problems for several years, and that his car was recently repossessed.

Both parties hold down full-time jobs. Mark Murray works for Saturn. His job often requires that he work overtime. Alma Murray's job with Astra Pharmaceuticals involves frequent travel. After separation and divorce, the parties had to adjust their visitation schedule to ensure that one would be on the scene to take care of the children when the other was unavailable. As a result, Mr. Murray exercised more visitation than was contemplated by the court's order, and Alma Murray did not object.

After Mr. Neiswinter arrived on the scene, Alma Murray would leave the children in his care when she had to go on business trips, sometimes without even telling Mr. Murray that she would be gone. Mr. Neiswinter also works for Astra Pharmaceuticals, so this has sometimes meant his leaving the children unattended while he was at the office, even though Mr. Murray or his father might have been able to look after them if they had been contacted. Alma Murray often had trouble getting the children to school on time, and they accumulated a large number of absences and tardies during the school year. Patrick Neiswinter apparently did no better.

It appears that after establishing a relationship with Patrick Neiswinter, Alma Murray attempted to exclude Mark Murray from her life and that of her children as much as possible. Such an attempt is in direct contradiction to a very important factor in determining child custody, "the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child." Tenn. Code. Ann. § 36-6-106(10).

We note that Alma Murray testified that Patrick Neiswinter has established a strong and loving bond with her children, and his testimony confirmed that. Such a bond with a stepfather can be very helpful to children, but not at the cost of erasing the bond with a loving natural father.

We believe that the trial court erred in ordering joint custody in this case. We also believe that Mark Murray is the most suitable person to exercise custody of the two children. We are mindful of the importance of the relationship between the children and their mother, but we believe that Mr. Murray will be able to (and must) foster that relationship while exercising custody. We, therefore, reverse the trial court's order of custody and award primary custody of the children to Mark Murray. The cause will be remanded for the trial court to determine the child support to be paid by Ms. Murray and an appropriate visitation schedule.

## IV.

The order of the trial court is reversed. Remand this cause to the Chancery Court of Williamson County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellant, Alma Murray Neiswinter.