IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 2000 Session

## LISA ALFARO MUNDAY v. WILLIAM MARK MUNDAY

**Appeal from the Chancery Court for Knox County**
**No. 100381-2      Daryl R. Fansler, Chancellor**

**FILED AUGUST 15, 2000**

**No. E1999-02605-COA-R3-CV**

In this post-divorce proceeding, the trial court designated William Mark Munday ("Father") as the primary residential custodian of two of the parties' children. He had been awarded primary residential custody of the parties' third child at an earlier time. Lisa Alfaro Munday ("Mother") appeals, arguing (1) that the trial court lacked subject matter jurisdiction to modify the custodial arrangement and (2) that there had not been a material change of circumstances to warrant a change in custody. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J. and HERSCHEL P. FRANKS, J., joined.

Mary Evars-Goan, Knoxville, Tennessee, for the appellant, Lisa Alfaro Munday.

Gregory S. McMillan and Charles W. Swanson, Knoxville, Tennessee, for the appellee, William Mark Munday.

**OPINION**

I.

The parties were divorced in 1990. The divorce judgment awarded the parties joint custody of their three children, Lisa Alexandra Munday (DOB: October 4, 1984) ("Alexandra"); Maria Christina Munday (DOB: May 3, 1986) ("Christina"); and Natalie Grace Munday (DOB: January 2, 1988) ("Natalie"). Mother was designated as the primary residential custodian of the children. In 1997, Father filed a petition to modify residential custody, specifically seeking primary residential custody of the parties' oldest daughter, Alexandra. Father also requested that the Court "make any necessary and appropriate amendments" to the residential custody of Christina and Natalie. An agreed order was entered on July 11, 1997, designating Father as the primary residential custodian of Alexandra. Christina and Natalie continued to reside with Mother.

In June, 1998, Father filed the subject petition in the original divorce case, seeking primary residential custody of Christina and Natalie. In his petition, Father alleged that the following constituted a material change of circumstances warranting an alteration of the custodial arrangement:

> [Mother's] mental and emotional status has changed so as to render her disabled from employment and from managing the emotional, physical and financial burdens associated with the responsibility of being a primary residential custodian of minor children. [Mother's] emotional or psychological disability results in a significant degree of lethargy which, in turn, causes the minor children to be called upon to maintain the home and care for the mother, essentially reversing the roles of mother and children. Also, [Mother] has separated from current husband and, upon information and belief, [Father] alleges that during the period of separation from her current husband [Mother] has exposed the minor children to inappropriate influences in her household.

Mother moved to dismiss Father's petition on the basis of a lack of subject matter jurisdiction, arguing that the petition raises issues of dependency and neglect, which issues, Mother contended, placed Father's petition within the exclusive jurisdiction of the juvenile court. The trial court denied Mother's motion and the case proceeded to trial on August 11 and 12, 1999.

The testimony at trial revealed the following facts. Mother was first hospitalized for depression in 1991. In October, 1996, Mother had what she described as a nervous breakdown and was hospitalized for a week. During her hospitalization, Mother reported having visual and auditory hallucinations. After being released from the hospital, she commenced therapy and started taking various medications. She admitted that she did not tell Father at the time about her 1996 hospitalization.

Mother denied having any visual hallucinations after leaving the hospital. Her medical records, however, indicate that Mother continued to suffer from hallucinations and other manifestations of her illness after her 1996 hospitalization. In August, 1997, she reported to her therapist that she was having hallucinations and conversations with God and Satan. In September, 1998, she called her therapist and reported that she thought that the rapture had occurred and that her neighbors were aliens impersonating human beings. Later that month, she reported increased paranoia, hallucinations, and delusions.

Mother did not recall making many of the statements documented in her medical records. She asserted at trial that, in any event, none of these psychotic episodes occurred in front of the children.

Mother is currently unemployed and receives disability benefits. She testified that there are days when she stays in bed, but that she gets out of bed when the children come home from school. Her disability records also reflect that she has difficulty with everyday activities. In March, 1998,

Mother completed a form entitled "Report of Continuing Disability Interview" with the Social Security Administration. In that document, Mother stated that she suffers from severe depression, panic attacks, confusion, and irrational thoughts and fears. She stated that her personal mobility "varies on a day to day basis" and that her children or her mother help her with most activities. She asserted that social contacts make her nervous and that she can drive but that she prefers to have her children with her. Mother further stated that she is not able to manage her finances.

In May, 1998, Mother completed an "Activities of Daily Living" questionnaire for the Social Security Administration. In response to a question regarding whether she hears, smells or sees things that later do not appear to have been there, Mother responded in the affirmative, noting "hallucinations, poison gas, sometimes I think I have supersensitivity to odors and auras and demonic forces in the world." She reported erratic sleep patterns and that she had thought at "different times" about ending her life. She stated that she can cook, shop, and do household chores only with assistance from her children or her mother. Mother further stated:

> Each day is different. Some days I feel like I will be able to get better and try to be hopeful. Other days I struggle to find a reason to keep living and fighting this overwhelming depression. Need help to do almost everything. Am afraid of people, places and activities. I don't know what causes the good days to be better or the bad days to be worse. Sometimes a memory or a conversation can cause a complete mood swing. My parents and my children give me a great deal of help with my life to keep everything going as close to normal as possible. I have to keep taking medicine and seeking therapist [sic] to try to stay optimistic. It caused me a great deal of stress filling out this form and my mother has helped me complete it.

Mother testified that since her hospitalization in 1996, her condition has improved dramatically and that recently "things have been very, very manageable. Very, very good." She reported that by September, 1998, she was able to take the children to basketball and football games and no longer needed their presence around her in order to perform certain tasks such as driving and cooking. Her medical records indicate some improvement in Mother's condition in early 1999. However, these records also indicate that she missed several counseling sessions in June and July, 1999. At trial, Mother could not recall that she had scheduled these appointments or that she had failed to show up for them.

Nell Alfaro, the children's maternal grandmother, also testified that Mother has shown marked improvement since her hospitalization in 1996. However, Alfaro indicated in a questionnaire submitted to the Social Security Administration in April, 1998, that Mother could not prepare meals without her children's assistance; that she could complete minimal housework with assistance from her children; that she needs frequent reminders to take her medication; and that her father manages her finances. Alfaro also stated in the questionnaire that Mother has difficulty distinguishing fantasy from reality and that some of her thoughts are bizarre.

Father admitted that, prior to the filing of the 1997 petition, he was aware of Mother's emotional and psychological problems. He knew Mother had been hospitalized for a brief period in 1991; however, he denied that he knew "the specifics of her hospitalization" in 1996 until after he had filed the 1997 petition. In fact, he asserted that he did not know the full extent of Mother's psychological problems until he read her medical records shortly before trial.

Dr. Bruce Seidner, a court-appointed clinical psychologist, conducted clinical interviews with Mother, Father, Father's current wife, Tracy Munday, and the three children. In addition to these interviews, Dr. Seidner administered various psychological tests and reviewed former evaluations of the children and parents as well as Mother's medical records.

Dr. Seidner first evaluated Mother, Father, and Tracy Munday in February, 1999. Although Dr. Seidner noted that in a previous evaluation conducted in 1994, another psychologist, Dr. Brietstein, had recommended that the children reside primarily with Mother, Dr. Seidner reached a different conclusion given the children's ages and stages of development:

> Developmentally, the continuity of caregiver which is critical for an infant and younger child is not the primary residence consideration for the preadolescent and adolescent who are exploring a social world in which they seek competence and autonomy. Given my study of the parents I do not believe that the optimal relationship for the girls from which to spring board into adulthood is the relationship to [Mother]. [Mother] appears to be struggling with her own emotional autonomy from [her] mother and with her own emotional stability. I am hard pressed to recommend a continuance of her home as the primary residence for the children given her disability status, unemployment, second marital choice, and having read through all of the documentation -- especially Dr. Brietstein's evaluation and deposition. It is my reading of his findings that he hoped the alienation would end and that there would be greater access to father. He was also concerned for continuity of care which is important for younger children.

Dr. Seidner noted that " too many indicators from previous evaluations" reflected that the children were in a caretaking role in Mother's home and were being actively alienated from Father. Dr. Seidner recounted that once when he called Mother's home to verify an appointment with Mother, he found her asleep in the late afternoon with a "very competent and almost adult sounding child," whom he believed to be Christina, assuring him that Mother would make her appointment with him and that further confirmation from Mother once she awoke would be unnecessary. Another appointment Dr. Seidner made with Mother was cancelled by her shortly before the scheduled time, ostensibly because she was sick. Mother told Dr. Seidner at the time that they made the appointment that it conflicted with some service she needed at the home but that she would make every effort to be there. Dr. Seidner noted that this incident raised issues of her reliability and was consistent with

Dr. Breitstein's findings of Mother's resistance and of the difficulty in scheduling appointments with her.

In August, 1999, Dr. Seidner conducted an evaluation of the three children, which included conducting clinical interviews and administering various psychological tests. Dr. Seidner noted in his evaluation that the results of the psychological testing reflect that both Christina and Natalie perceive that Father is the parent who is best able to meet their needs. Dr. Seidner noted that this result was consistent with Christina's stated preference to live with her father. Natalie, however, was more conflicted in her stated preference; she "was frequently tearful...and repeatedly expressed a concern that mother would miss her if she were made to live with father." Dr. Seidner noted that "[c]onsciously she is advocating for the status quo while on the testing she perceives the father as overall more competent to meet her needs."

Dr. Seidner expressed significant concerns about Christina in his evaluation. He described her as "an adolescent who, without significant intervention, is on a fast track towards developing a borderline personality disorder." He indicated that her behavior during the interview was often "removed and eccentric":

> During our interview, when she wasn't being provocative – imitating the examiner taking notes, laughing to herself, and drawing odd pictures, she behaved in a removed and eccentric manner. To her credit she views herself as an artist and poet struggling to find her voice. While there is a good deal of adolescent drama and posturing at play here, it belies her lack of an adequate identity, a significant alienation from her peers, and the disturbing fluidity of her experience. It is noteworthy for instance that she is in an all girl band whose name is "Chaos." Of course the "band" does not practice or have any material. It is just something to belong to. Equally poignant is her description of her poetry. While describing her preferred activity as "being alone writing poetry" she goes on to explain, "it's not really my poetry. I take the words from what people say."

> In the course of discussing these issues she dramatically uttered, "could you help me find the source of my pain and remorse? I fear I've fallen down to my knees. If you hear me, help me please, this confusing state that I am in has left me floating, no wind." It was at first unclear if these were her words. When prompted she wryly attributed them to a bit part in the movie 'Con Air.' Then again, without missing a beat, she said, "nobody knows a cure for what I have." After asking for clarification she described this too being a line from the movie. She describes this line as having become a "stanza" that she identifies with. Unfortunately it is emblematic of

her serious clinical depression, lack of a healthy identity, and disturbed self-esteem.

Dr. Seidner also described the home environment of each parent. He characterized Mother's home as clean, but in various stages of disrepair. He noted that the children admitted that it was "unusually picked up" for his visit. Dr. Seidner noted "a good deal of uncomfortable silence and anxious side-glances in the family" during their meeting. He also observed that "[t]here was little sense that the girls did much with each other, each appearing to be wandering in and out of the house when not occupied with [the] interview." Also during this interview, Dr. Seidner noted more of Christina's "provocative" behavior. When asked to show him meaningful possessions, Christina showed him a bow and a machete. Dr. Seidner also noticed several drawings in Christina's room, including one of the "death angel."

Dr. Seidner observed that Father's home was "modest and well laid out." He interviewed the family during breakfast, noting that the family appeared relaxed and that they were joking with one another. He noted that when he interviewed Father and his wife alone, the girls went to another room together where they played video games and spent time with each other. Dr. Seidner further observed that Christina presented herself as "quite conventional," with none of the provocative behavior exhibited at Mother's home.

Dr. Seidner also discussed Mother and Father's parenting styles in his evaluation. He noted that Mother felt that the children misunderstood her insistence on self-reliance. Mother expressed to Dr. Seidner that her reliance upon the children's cooking and cleaning on one hand while giving them latitude to pursue their own activities on the other is a means of instilling adult independence and responsibility in the children. She indicated to Dr. Seidner that "children need time to be children" and expressed her concern that Father "overcommitted" them to school and extracurricular activities. She told Dr. Seidner that "[w]hen we moved to the country we left the toys behind, they love to explore and be in nature. I am not sure what they do, they're just happy to roam around. I don't know what they do, they come home with a frog or a lizard...." Mother expressed her concern with Christina, noting that she had sought counseling for Christina but could not continue the sessions because she could not afford them. She told Dr. Seidner that she identified with Christina's "sensitivity" and that she too was depressed and had thoughts of suicide at that age.

Father and his current wife described their parenting style to Dr. Seidner as emphasizing structure and activities. Father expressed particular concern over Christina's behavioral changes, noting that Christina suffered from a lack of social interaction and organized activities. He also expressed his view that Natalie needed activities as well as proper role models, which Father thinks she does not currently have in Mother's residence.

Dr. Seidner concluded that it would be a "consequential error" to split the children between the parents. He opined that Father and his current wife "demonstrated that they have a better handle on the girl's [sic] need for structure and support to develop themselves." He further recommended that Christina be referred to a therapist in order to address her personality and emotional issues.

Although Christina had expressed to Dr. Seidner that she preferred to live with Father, she declined to state a preference at trial, explaining that she preferred that the judge decide the issue because she did not want to hurt either parent's feelings. At trial, Natalie again expressed her desire to live with Mother.

Following the trial, the court below issued its memorandum opinion from the bench. The trial court found a material change of circumstances such that a change in custody would be in the best interest of the children. Specifically, the court found as follows:

> It is clear that beginning in October of 1996, [Mother] sustained a mental illness that rendered her incapable of caring for herself or others; required hospitalization at Lakeshore.
>
> It is also clear that based on Dr. Seidner's unrefuted testimony, expert opinion in this case, that Christina is a child that currently suffers from emotional and/or mental problems. Dr. Seidner indicated that she was a child that was one with significant psychological trouble in her life. He described her as troubled and clinically depressed and in need of immediate intervention or she was going to be on the fast track of some serious problems.
>
> *       *       *
>
> It is clear that continuing after July of 1997 that the episode of October [19]96 had not resolved itself. [Mother] had been hospitalized in 1991 with an apparent recovery. It is clear that not only did she not recover within a short period of time after October of 1996, the Court, based upon her testimony today and the records submitted from Cherokee Health Systems, concludes that [Mother] continues to suffer a significant mental impairment.
>
> *       *       *
>
> The Court had some difficulty with [Mother's] testimony at times. There were long delays that will not show up in this transcript that this Court had the opportunity to observe, delays which this Court felt would not be warranted in response to that particular question unless some person was either unable to mentally appreciate the question or was unnecessarily considering her answer before rendering the answer, which brings into question either [Mother's] ability to respond coherently or her ability to answer truthfully to some of these questions.

This appeal followed.

II.

Mother first argues on appeal that the trial court lacked subject matter jurisdiction to determine custody in this case because the allegations in Father's complaint raise issues of dependency and neglect of the children. She relies upon the provisions of T.C.A. § 37-1-103(a)(1) which vests "exclusive original jurisdiction" in juvenile court of "[p]roceedings in which a child is alleged to be...dependent and neglected."

We find this argument wholly without merit. Although Mother is correct in asserting that, pursuant to T.C.A. § 37-1-103(a)(1), the juvenile court has exclusive jurisdiction over proceedings in which a party seeks to have a child declared dependent and neglected, Mother mischaracterizes the nature of the instant proceeding. This *is not* a proceeding to have a child declared dependent and neglected; this *is* a post-divorce proceeding seeking a change in a custodial arrangement. As such, it was properly brought in chancery court. Therefore, the chancery court, the site of the original divorce proceedings, properly exercised jurisdiction over Father's petition. This issue is found adverse to Mother.

III.

Mother next argues that Father failed to prove a material change of circumstances since Father last sought custody of the children such as to warrant a change in the custodial arrangement. She further contends that even if a material change has occurred, an alteration of the custodial arrangement would not be in the best interest of the children.

In this non-jury case, our review of the trial court's findings of facts is *de novo*; however, the case comes to us accompanied by a presumption that those findings are correct -- a presumption we must honor unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Musselman v. Acuff,* 826 S.W.2d 920, 922 (Tenn. Ct. App. 1991). Our search for the preponderance of the evidence is tempered by the principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such determinations are entitled to great weight on appeal. *Massengale v. Massengale,* 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995); *Bowman v. Bowman,* 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991).

Father's petition to modify the custodial arrangement addressed itself to the wide and sound discretion of the trial court, and "we will not tamper with that discretion unless the facts demonstrate that the trier of fact has abused his or her discretion." *Brumit v. Brumit,* 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997).

An initial award of custody is "subject to such changes or modification as the exigencies of the case may require." T.C.A. § 36-6-101(a)(1) (Supp. 1999). This court has noted that the initial judgment awarding custody "is *res judicata* and is conclusive in a subsequent application to change custody unless some new fact has occurred which has altered the circumstances in a material way so that the welfare of the child[ren] requires a change of custody." *Griffin v. Stone,* 834 S.W.2d

300, 301-02 (Tenn. Ct. App. 1992). The best interest of the children is the paramount consideration. *Musselman,* 826 S.W.2d at 922.

The evidence does not preponderate against the trial court's finding of a material change of circumstances warranting a change of custody. The trial court found that Mother "continues to suffer a significant mental impairment," which required her hospitalization in 1996 and from which she has not completely recovered. Although Mother asserted that she has dramatically improved since her release from the hospital, the evidence reflects otherwise. After her hospitalization, Mother continued to experience hallucinations, paranoia, and depression, which often prevented her from performing everyday tasks and required her to depend heavily on her children to run the household.

We further find that the evidence does not preponderate against the trial court's finding that Christina's developing emotional and psychological problems constitute a material change in circumstances. Father testified that since July, 1997, he has noticed dramatic changes in Christina's personality and behavior. He observed that she often speaks negatively about herself and has become "very withdrawn" and "morbid" and writes poetry that is "extremely dark." Dr. Seidner also expressed his concern that Christina is suffering from serious clinical depression and is developing a borderline personality disorder, both of which require, in Dr. Seidner's opinion, significant intervention.

We find that the trial court's award to Father of residential custody is in the best interest of the children. In doing so, the trial court relied upon the recommendation of Dr. Seidner, who concluded that Father would best provide the appropriate structure and support that both Christina and Natalie need. Dr. Seidner also noted Mother's reliance upon the children and opined that Father would place less of an emotional demand on the children. Dr. Seidner's conclusions are supported by the results of the psychological testing in which both children indicated that Father was the parent who best met their needs. Based upon all the evidence adduced at trial, we find that the trial court correctly found that a change of residential custody would be in the best interest of the children.

IV.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant. This case is remanded for enforcement of the judgment and collection of costs assessed below, all pursuant to applicable law.

_____
CHARLES D. SUSANO, JR., JUDGE