IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT JACKSON
_____

JEAN KELLY FISHER WALLACE,                    Shelby Chancery No. 20775-1
                                              C.A. No. 02A01-9702-CH-00029
     Plaintiff,

v.                                            Hon. C. Neal Small, Judge

RICHARD EDWARD WALLACE,

     Defendant.

HAL GERBER and KAREN R. CICALA, Gerber Law Office, Memphis, Attorneys for Plaintiff.

DANIEL LOYD TAYLOR and JAMES H. TAYLOR, Memphis, Attorneys for Defendant.

*AFFIRMED*

Opinion filed:
_____

**TOMLIN, Sr. J.**

     This is a post-divorce custody proceeding. Jean Kelly Fisher Wallace ("mother") was granted a divorce in the Chancery Court of Shelby County from Richard Edward Wallace ("father") in May, 1992. Mother was awarded custody of the parties' minor child, Caroline. In April, 1995, father filed a petition to change legal custody from mother to father. Following a bench trial, the court denied the relief sought by father and permitted custody to remain with mother. The court delayed its decision for six months, principally to allow mother the opportunity to make changes in two aspects of her life: (1) the neighborhood in which she and the minor child had been living for slightly over a year and (2) her ongoing association and relationship with her boyfriend. The trial court felt both aspects were detrimental to the welfare of the parties' child.

     At the hearing some six months following, based upon the stipulation of the parties that mother had moved to a more appropriate neighborhood and mother's sworn affidavit that she had terminated her relationship with the man in question, the trial court decreed that custody of the child would remain with mother. He ordered father to pay the full amount of attorney fees for mother's first attorney and half the amount of the attorney fees of mother's second attorney. He denied father's motion for the payment of his attorney fees by mother. Father has raised the following issues on appeal: the trial court erred in: (1) failing to change custody from mother to father, (2) allowing mother to introduce as evidence facts which predated the divorce and which

were not disclosed during discovery, (3) refusing to allow testimony comparing similarities between mother's present boyfriend and a former boyfriend, and (4) in assessing attorney fees for mother against father and in failing to award father his attorney fees. For the foregoing reasons, we affirm the decree of the chancellor.

The record reflects that mother met Harry Nicholas, her boyfriend at the time of trial below, approximately one year after her divorce. Nicholas owned and operated a small but popular restaurant in Memphis. They soon became close personal friends. As mother described it, they had "an exclusive relationship." They traveled together, took vacations together and, according to the testimony of Nicholas, saw each other four to six nights a week.

Mother has been employed since the divorce in a business owned and operated by her family. Her income has been approximately forty thousand dollars per year from all sources. Mother comes from a prominent, well-to-do family in Memphis and they help support her and their granddaughter. There was some testimony to the effect that the parents paid for the kindergarten which the child attended. The child was approximately seven years of age at the time of trial below.

Shortly after the divorce, mother began looking for a new home for her and her daughter. She had been living in a townhouse in east Memphis in a nice section of the city, but she felt there was not enough of an outside yard or a play area for her daughter. Mother ultimately found a small but well kept two bedroom home on New York Street. This is where mother and her daughter were living at the time of the hearing. From most of the witnesses who testified, New York Street could best be considered as being "in a transition stage." New York Street is not a long street, but it is separated into two segments by Central Avenue. Most if not all of the street runs parallel to a railroad track serving one of the railroads in Memphis.

Photographs of the neighborhood reveal that there were older, vacant houses in the area, as well as commercial properties, some bounded with fences topped with barbed wire. In addition, between January 1, 1994 and June 30, 1995, the records of the Memphis Police Department showed that thirty-nine criminal offenses took place on New York Street, although it is not clear how many took place in the vicinity of mother's residence. Among these offenses were an assault, a bomb threat, robberies, thefts, stolen automobiles, vandalism and burglaries.

The testimony concerning Harry Nicholas was in some ways even more detrimental than

2

the testimony pertaining to New York Street. Mother admitted to her psychiatrist that Nicholas was both an alcoholic and a crack smoker. In this regard, the testimony at trial was to the effect that while Nicholas had broken his crack habit, he was still drinking on a regular basis, albeit not necessarily to excess. Nicholas testified that he was going to seek treatment, but up to the time of trial had not done so.

In 1995, in Lonoke, Arkansas, mother and Nicholas were in a vehicle stopped by police. Mother, who was driving, refused to take a breathalyzer test. During the incident, the officer testified that Nicholas became belligerent, argumentative, and cursed him, causing the officer to handcuff him and place him in the back of the squad car. Nicholas was subsequently convicted of possession of a controlled substance, marijuana. The record reflects that Nicholas had been arrested previously and convicted of driving under the influence of alcohol in both Florida and Tennessee. Nicholas testified that he could not remember the number of times he had been arrested in Tennessee since 1989.

In addition, there was testimony concerning other incidents involving Nicholas, such as assaulting a man with whom he had started an argument by driving his car onto a sidewalk and striking the man with his car. Nicholas left the scene without rendering aid to the victim, who suffered a fractured leg. Another incident related by a witness was Nicholas' attempt to run his car through a chain-link fence in an effort to run over his neighbor's dog, whose barking had irritated Nicholas.

Mother testified that she never spoke to Nicholas about his arrests or drunken behavior because they "were in the past and did not concern her." She further testified that she did not believe that Nicholas was a danger to Caroline and she had occasionally allowed him to supervise Caroline alone. Prior to the filing of his petition, father had expressed concern to mother about Caroline being around Nicholas. At the time of trial, an injunction was in effect prohibiting mother from permitting Caroline to be in Nicholas' presence.

Inasmuch as father was seeking to have custody transferred from mother to him, mother presented relevant testimony concerning the conduct of the father in dealing with both her and Caroline as well as other aspects of his life. It was brought out that father, an independent realtor, lived in a nice home in east Memphis. There was further testimony in the record that father had a bad temper and that it showed from time to time. The record itself reflects that

3

during cross-examination of father by lead counsel for mother, father lost his temper in the courtroom and it was necessary for father's counsel to ask for a suspension of the examination at that time to permit father to cool down.

In addition, there was testimony of witnesses concerning father's conduct at a family get-together and another time at the wedding and reception of a relative of mother. Father's conduct was described as rude, inappropriate and an embarrassment to both mother and Caroline, to the extent that on one occasion Caroline became upset and hysterical. There was also testimony from mother that on several occasions father had made arrangements for he and Caroline to be together on a weekend when it was mother's time for custody, resulting in further upset to the parties' child. It also should be noted that the proof reflected that father was a rehabilitated alcoholic, although he occasionally had a drink or a beer from time to time.

In the case before us, the chancellor noted that he had two serious questions about mother's conduct insofar as the issue of custody is concerned. The first dealt with her choosing to live in the neighborhood that she selected on New York Street. The court noted that it was far removed from where she worked and where the rest of her family lives in east Memphis and that it was not financially necessary for her to live there. The court also noted that after hearing the proof and making a personal inspection it was less than a desirable place to raise a child.

The court's second concern which alarmed it more than the first was mother keeping company with Nicholas, noting that Nicholas had or did have drug problems and was an admitted alcoholic. The court further commented upon Nicholas' temper and his recorded actions of seeking to strike a neighbor's dog with his car and running onto the sidewalk with his car to run over a man. As the court stated: "There's just no justification in having any kind of relationship with a person like that that would involve this daughter."

Having so stated, the chancellor then addressed the desirability of placing full custody with father. The court observed: "Had Mr. Wallace been a little more careful in his conduct in relation with his daughter and ex-wife, the court might see this case differently. The court just doesn't believe that he has really given the wife a chance to show what she can do with the child..." The court was of the opinion that father had attempted to manipulate child visitation arrangements and had used poor judgment from time to time in seeking to plan activities with the parties' daughter. The court also took a dim view of the father's "quick temper." After

4

analyzing the options on both sides, the court stated:

> I may have said this before. From time to time in these cases we just wish there was some body else available that could step up and say, well, I'll take care of these children, or this child or children, it has been a time or two when the court made that kind of choice.

The court continued the case for six months. He expressed his desire to know what mother's number one priority was, the child or Nicholas. He further expressed interest in knowing what took place during this period of time relative to her living on New York Street. Concluding his observations regarding Nicholas and mother, the court stated:

> Let me just say flat out right now that if there has been no change in that relationship, the court will be very seriously interested in exploring all possibilities for making arrangements for this child that I think would be in the best interest of the child.

Finally, the chancellor made it plain that there would not be a further evidentiary hearing, but that in addition to relying upon the record already made the court would be appropriately advised as to what steps mother had taken in response to the statements made in open court by the court. The court's order continuing the cause stated, in part:

> [T]he Court finds that it is not satisfied with the conduct of Petitioner in his dealings with Respondent concerning the interests and welfare of their child, nor is it satisfied with the location of Respondent's residence and her continued association with a male friend, as the result of all of which it is the opinion of the Court that this cause should be continued for further consideration.

Following the expiration of the six month waiting period, the order of the chancellor reflects that the parties stipulated that mother had moved to a satisfactory residential location. In addition, mother filed a sworn affidavit to the effect that she had discontinued her association with her boyfriend, Harry Nicholas. The concluding statement in her two-page affidavit sums it up in this manner:

> I have no plans to resume any kind of romantic relationship with Mr. Nicholas

and do not think that it is possible to have an active friendship, as it would possibly cause him to be around my daughter or possibly cause him to get the wrong idea about my intentions regarding reforming a relationship with him.

The trial court's order concluded that the best interest of the child would be served by the child remaining in the custody of mother. The petition for change of custody was denied.

In addition, the court ordered father to pay mother's former counsel fees in the amount of $3,612.50 and to pay mother's present counsel, the Gerber Law Firm, one-half of the total fees incurred at trial, in the amount of $13,483.48. This appeal followed.

## I. The Custody Issue.

Our scope of review in a custody case is *de novo* upon the record accompanied by a presumption of correctness. We must affirm, unless the preponderance of evidence is otherwise. Hass v. Knighton, 676 S.W.2d 554 (Tenn. 1984). We have reviewed the evidence in this record, to a point more extensive than just those incidents recited in this opinion. This court is of the opinion that the chancellor did not err in denying father's petition for change of custody, thereby permitting the child to remain with mother.

The paramount consideration in a custody proceeding such as this is the best interest of the child. The issue before the trial court and this court is whether to modify a prior custody order. In such cases the comparative fitness analysis, most appropriate at the time of the original custody decree, need not be repeated. Musselman v. Acuff, 826 S.W.2d 920, 922 (Tenn. App. 1991). Rather, in a modification proceeding such as this, in order to change custody the trial judge must find a material change in circumstances that is compelling enough to warrant the dramatic remedy of changed custody. The burden is on the non-custodial parent to prove changed circumstances. Id.

This case is one of the more unusual child custody cases. It was readily apparent to the trial court and likewise to this court that as the petitioner seeking to modify a custody decree, father was able to establish two material changes in circumstances affecting the parties' daughter: that of the residence of the custodial family and perhaps of even more importance, mother's involvement with a person found by the court as being an undesirable companion to have in the presence of the parties' minor daughter. This court was a bit puzzled by the action of the

6

chancellor in postponing his decision in this case at the conclusion of all the proof. However, after reading the record this court readily understands and commends the chancellor for his action.

What the trial court obviously observed was that while the proof presented revealed two circumstances that if left unmodified could well adversely affect the welfare of this child, in looking at the alternative of placing the child in the custody of father, the court opined that the child would not likely be much better off. In addition, the court recognized that there were overt steps that mother might take to rectify the situation in order to retain custody of the parties' child. During this recess, mother eliminated both of the negative factors preventing her from retaining custody. With these out of the way there were no material changes in circumstances that could be laid at the feet of the mother.

It was apparent to the trial court, as it is apparent to this court, that the negatives that the court observed in father were so innately a part of his personality and outlook that he was not likely to be able to correct them as quickly as mother had. Through exercising a bit of wisdom and perhaps some courageous action, mother readily eliminated the cloud over her custody.

Having said all the above, this court feels constrained to speak both to mother and father. They have a continuing, ongoing obligation to conduct themselves at all times in a loving, caring manner in dealing with their daughter, whether it is through their interpersonal relationships with her or indirectly through their associates and their lifestyle. While there might not be any love lost between mother and father, they must each develop civility and demonstrate respect for the other and realize that notwithstanding the extent of blame to be placed upon each of them in the breakup of their marriage, their daughter was and is the innocent victim. She deserves the very best in love, affection and moral upbringing that they can give to her.

Without attempting to ascertain and set forth the reasons therefore, it is also apparent that mother in the past has had to deal with some emotional and psychological trauma that affects her relationship to others. Father must keep this in mind in his dealings with her. On the other hand, mother must be aware of this as she chooses her friends and relationships during the years ahead. She should seek to develop a few close friends of character and integrity who can give her the quality of advice and counsel that she might need from time to time.

To the father, we strongly urge him to control his temper, both in public and otherwise.

7

While the record does not reflect any serious display of temper towards the child, he should learn to be solicitous, considerate and kind in all his dealings with her. Both parties' should avoid using this child in any attempt to get back at the other party. We join with the chancellor in alerting both mother and father that if they cannot give this child the upbringing that she deserves-nay, that she is going to need in this world today, then there are always alternatives in the form of a foster home or similar accommodations to assist this little girl in growing up to womanhood, equipped to become a loving wife and mother in her own right. Accordingly, we conclude that this issue is without merit.

## II. The Evidentiary Issues.

A. The allowance of evidence predating the divorce decree.

Father contends that the court, over objection of father's counsel, allowed mother's mother to testify regarding statements by father, prior to the divorce, whereby he admitted that he was an alcoholic and that he attended AA meetings. Mother contends that the testimony was offered and admitted not for the purpose of relitigating the issue of alcohol, but was relevant in light of the fact that father testified that he still drinks from time to time. From reading the record it does not appear that this testimony had any bearing on the ruling of the chancellor and it was not error on his part in admitting it into evidence. On the other hand, if it was error we hold it to be harmless error.

B. The comparable boyfriend issue.

It seems that on direct examination mother was asked by her counsel to describe the difference between Harry Nicholas, and a former boyfriend named David. In response to this questioning she described David as being abusive and Harry as not being abusive. David was also characterized as a freeloader while Harry was described as a successful businessman. Father contends that the court erred in sustaining objections to father's counsel attempting to cross-examine mother's father for the purpose of bringing out comparisons between Harry and David. To say the least, the testimony would have been redundant, and of less materiality coming from the father of the person involved, rather than the person herself. We find this issue without merit as not being erroneous, and again, if error to be harmless error.

8

### III. The Attorney Fee Issue.

At the conclusion of the trial below, the chancellor ordered father to pay the full amount of $3,612.50 to mother's former attorney, and one-half of the total fees due to the Gerber Law Office by mother, said amount being $13,483.48. It denied father's request that the trial court order mother to pay his attorney fees. It is well settled that in this state the trial court has the discretion to award attorney fees to the "prevailing" party in an action for a change of custody of a minor child. T.C.A. § 36-5-103(c) (Supp. 1997). Here we have both the custodial parent and the noncustodial parent seeking court-ordered attorney fees. Given the unusual circumstances of this case, we are of the opinion that the chancellor did not reach the correct result.

There were conditions existing in and about the custodial home that were potentialy harmful to the best interest of the child. These conditions were called to the attention of the court by virtue of father's petition to change custody. Therefore, despite the fact that mother retained custody, father claims to have been the prevailing party because his action in filing the petition and litigating this matter resulted in the correction of the child's deleterious circumstances and enured to the best interest of the child.

However, while father did society in general and his daughter specifically a favor in bringing this action, it appears from the record and from the conclusion reached by the trial court that he had very little positive to offer the court as an alternative custodial domicile to the circumstances surrounding mother. In other words, but for the residence of mother and the existence of her boyfriend, there would have been no basis to change custody to father. Therefore, father cannot be properly considered the prevailing party and should not be awarded attorney fees.

On the other hand, it could be contended that mother was the "prevailing party" in this litigation. However, she became so only as a result of the trial court giving her a second chance to straighten her life out. Mother has the resources to pay her own attorney fees, and under the peculiar circumstances of this case, it would be unjust to require the father to pay any part of these fees. In this court's opinion, the trial court's award of attorney fees should be vacated and neither party should collect attorney fees from the other.

Lastly, this court is constrained to call to the attention of counsel for both parties that

9

when dealing with child custody cases, which are ordinarily charged with emotion and strong feelings on the part of the two parents involved, counsel for the parties should endeavor to keep this tension at a minimum, if not eliminate it from the proceedings, and not let the passions of the day arouse them to create even more tension and hostility in the trial of such cases.

The judgment of the trial court is vacated as to attorney fees, but affirmed in all other respects. Costs in this cause on appeal are taxed one-half to father and one-half to mother, for which execution may issue if necessary.

_____
TOMLIN, S.J., W.S.


_____
CRAWFORD, P.J. W.S.                (CONCURS)


_____
FARMER, J.                                    (CONCURS)