IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 13, 2002 Session

## ELIZABETH DONAHUE WHITAKER v. LAWSON S. WHITAKER, III

Appeal from the Circuit Court for Hamilton County
No. 99-D-199     Jacqueline E. Schulten, Judge

### FILED FEBRUARY 25, 2003

### No. E2002-00847-COA-R3-CV

In this post-divorce case, Lawson S. Whitaker, III ("Father") filed a complaint against Elizabeth Donahue Whitaker ("Mother"), seeking to hold her in contempt of court for depriving him of visitation privileges and parenting time with the parties' minor daughter, Grace Anne Whitaker (DOB: September 6, 1996) ("the child"). In response, Mother filed, *inter alia*, a counterclaim for contempt and for modification of the parties' Parenting Plan. The trial court found a substantial and material change in circumstances justifying a modification of the Parenting Plan. In addition, the trial court held Father in contempt due to his failure to follow the court's prior orders and for harassing Mother. Father appeals both the modification and the court's finding of contempt. Mother seeks attorney's fees for this appeal. We affirm and remand to the trial court for that court to set attorney's fees for Mother in connection with this appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded with Instructions**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

Michael E. Richardson, Chattanooga, Tennessee, for the appellant, Lawson S. Whitaker, III.

Leslie B. McWilliams, Chattanooga, Tennessee, for the appellee, Elizabeth Donahue Whitaker.

**OPINION**

I.

Mother and Father were divorced on June 23, 2000. The divorce judgment included a Permanent Parenting Plan ("the Plan"), in which Mother was designated the primary residential parent of the child. Father, who was employed as a traveling photographer with Olan Mills Studio,

typically worked from Tuesday until Saturday afternoon each week. In order to accommodate Father's work schedule, the parties agreed to visitation as follows:

> Prior to enrollment in school, the child will reside with Mother, except for the following days and times when the child will reside or be with Father: Every other week from Sunday at noon until Monday at 7:00 p.m., and the alternate week from Sunday at 9:00 a.m. until Monday at 7:00 p.m. If the Father has a weekend business meeting the overnight can be changed to Monday with seven (7) days['] notice to Mother. If Father has to work on Monday, with seven (7) days['] prior notice to Mother and there are no prior set plans for special events for the child or serious illness (defined as a fever or nausea), Father shall be entitled to pick the child up on Saturday evening at [7:00] p.m. and return the child to day care on Monday morning.

> Mother shall be entitled to one weekend every other month with the child, and on that weekend Father's time shall be from Monday morning until Tuesday morning. Mother's weekend shall not be on a [Monday that the father has to work, provided that he has notified her in advance of his work schedule. Mother shall give father 7 days' notice of her plans to change the weekend time. Since the father usually works out of town 5 nights per week, when he is working in Chattanooga, he shall be entitled to have the] child on Wednesday between 8:00 a.m. and 2:30 p.m. provided that the child is to be with the Father the entire time, or as otherwise agreed upon by the parties. Father shall give at least seven (7) days notice of his plans to exercise this weekly time with the child. Father shall provide to the Mother copies of his weekly and holiday schedule when they are received by him.

(Language in brackets in second paragraph added by trial court at a later date).

On November 14, 2000, Father filed a complaint seeking to hold Mother in contempt of court. In his complaint, Father alleged that Mother denied his scheduled visitation with the child on several different occasions. In addition, Father asserted that Mother frequently interfered with his telephone calls and conversations with the child. Mother filed an answer, denying Father's allegations. In a counterclaim, Mother alleged that Father has refused to cooperate with her since the entry of the divorce, has "failed to give her any copies of his work schedule, and has repeatedly failed to advise [Mother] of his change of plans." Mother asserted that there has been a material and substantial change in circumstances since the divorce, "in that the minor child has developed significant behavior problems." Mother claimed that the current visitation arrangement is too disruptive for the child and that it should be modified. Mother also contended that Father has repeatedly taken the child to the doctor and dentist without the prior knowledge or consent of Mother, and that Father has "engaged in ongoing inappropriate conduct in the presence of the child at the child's school . . . ."

Hearings were held on the competing claims on November 6, 2001, and December 6, 2001. At the conclusion of the hearings, the trial court issued its ruling from the bench, holding Father in contempt of court "for failure to follow these [*sic*] Court's orders, as well as harassing [Mother]. And if you do it again, you'll serve the ten days that I'm [suspending] today." The court then incorporated the transcript of its ruling into its Final Order. With respect to the Plan, the court, through its Order, modified it as follows:

> Prior to enrollment in school, the child will reside with Mother, except for the following days and times when the child will reside or be with Father: Beginning December 14, 2001, and continuing every other weekend thereafter, from Friday at 6:00 p.m. until Sunday at 6:00 p.m. except as otherwise stated in this plan.
>
> As soon as he is aware of his schedule, Father shall notify Mother when he is going to pick up the child if he is not going to be available at 6:00 p.m. on Friday. Father shall provide to the Mother copies of his weekly and holiday schedule when they are received by him.

In addition, the trial court "restrained and enjoined [Father] from taking the child to the doctor or the dentist unless requested by [Mother], or in the case of an emergency and [Father] is unable to locate [Mother]." The court also "permanently restrained and enjoined [Father] from being in the child's classroom." From this judgment, Father appeals.

## II.

In this non-jury case, our review of the trial court's factual findings is *de novo*; however, the case comes to us accompanied by a presumption that those findings are correct – a presumption that we must honor unless the evidence preponderates against the trial court's factual findings. Tenn R. App. P. 13(d); ***Musselman v. Acuff***, 826 S.W.2d 920, 922 (Tenn. Ct. App. 1991). Our search for the preponderance of the evidence is tempered by the principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such determinations are entitled to great weight on appeal. ***Massengale v. Massengale***, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995); ***Bowman v. Bowman***, 836 S.W.2d 563, 567 (Tenn. Ct. App. 1991).

## III.

### A.

Father first argues that the trial court erred in finding him in contempt of court and imposing upon him a suspended sentence of ten days in jail, as "he did not knowingly violate any provision of the Final [Divorce] Decree and Permanent Parenting Plan." We disagree.

In issuing its ruling from the bench at trial, the court gave two reasons for holding Father in contempt: first, for failing to follow the court's orders, and second, for harassing Mother.

Section 2.2 of the Plan provides that "Father shall provide to the Mother copies of his weekly and holiday schedule when they are received by him." Father's employer, Olan Mills Studio, provides him with a calendar each year setting out his schedule for the entire year. However, Olan Mills also provides Father with a weekly schedule that apparently contains the details of when and where Father will be working each week. Father readily admitted at trial that he had provided Mother with the yearly calendar of his work schedule, rather than the weekly schedules:

> [The yearly calendar] has been 99 percent accurate, 100 percent most of the time. It is what I go by when I make plans. I look at this and that tells me whether I'm working that day or not. That is sufficient, you know, notice to [Mother] when I work on Monday and when I should have the child.
>
> I have gone beyond that to give [Mother] calls to remind her to look at the schedule that I am working. And she has forced me to go beyond that to give her a weekly work schedule that I get less than seven days before the work day, and that work schedule has information that's really not pertinent to [Mother] and that can even change.

Mother's counsel cross-examined Father about the importance of the weekly schedules as follows:

> Q: [The weekly schedule is] much more current than something that you received more than two years ago, isn't it?
>
> A: That's correct.
>
> Q: This schedule also tells the location of where you're going to be working so it's possible for [Mother] to be able to calculate what time you may be arriving to pick up Grace as well, doesn't it?
>
> A: That's not relevant I don't believe.
>
> Q: It's not relevant if you're five hours away from here and you're scheduled to work until 5:00 on Saturday for [Mother] to know that there's no way you're going to be able to pick the child up at 7:00 on Saturday?
>
> A: My pickup time is 7:00 Saturday, and what that schedule says is not relevant to when I pick her up.

Q: [Father], are you telling this court if you are working an assignment that's five hours away on Saturday and you're scheduled to work until 5:00 on Saturday that you're going to be here at 7:00 to pick the child up?

A: Where I'm scheduled to work is not relevant to my 7:00 pickup time. If I have a 7:00 pickup time, I will make every effort to be there by 7:00. If I can't, I would call [Mother] and tell her that I would not be able to.

Q: On that Saturday evening or that Saturday afternoon when you weren't going to be there on time?

A: That's correct.

Q: And you understand that [Mother] is a single parent, you understand that your daughter is left with very few individuals, and that if [Mother] has plans for Saturday evening assuming you're taking your daughter as you are saying you're going to at 7:00 and you don't bother to show up or you don't bother to call until Saturday afternoon, that that seriously interferes with her ability to carry out her plans?

A: I don't believe that's relevant.

Clearly, Father not only knowingly, but intentionally failed to provide Mother with his weekly work schedules, even though he was under a court order to do so. At the conclusion of the trial, the court again instructed Father to provide Mother with a copy of his weekly schedule as soon as he receives it each week, "so that [Mother] may try to attempt to schedule those alternating weekends and know whether or not you're actually going to be there or not to get [the child]."

Furthermore, the Plan provides, in section 3.3.1, as follows:

Mother and Father shall conduct themselves with respect to each other and the child so as to provide a loving, stable, consistent and nurturing relationship with the child even though they, themselves, are being divorced. To that end they will not speak derogatorily of each other or the members of the family of the other, will not cause the child to be drawn into any dispute regarding decisions affecting the child and will not attempt to curry favor with the child to the detriment of the other.

-5-

The record is replete with instances of the Father violating this provision. Mother testified that, on one occasion, Father, while standing in the doorway of Mother's house, grabbed the child and told Mother that he would have her "thrown in jail" if she ever prevented him from seeing the child again; Mother stated that, on that particular evening, she was late getting home from her sister's house due to traffic and that Father was angry because he was unable to pick up the child at the scheduled time. A nursery school worker at the parties' church testified to an instance at church when the child was unwilling to leave with Father as scheduled. When Mother was encouraging the child to leave with her Father, Father grabbed the child away from Mother, and in the process, the child bumped her head on the corner of a desk. Father simply carried the crying child out of the building, as she was reaching back for Mother and the child's older half-sister, Rachel.

Finally, Rachel, Mother's eighteen-year-old daughter from a previous marriage, testified about an occasion when Father arrived at the church with the child unexpectedly. Rachel was working at the church that week, assisting with vacation bible school. Mother had instructed Rachel that if Father attempted to leave the child at the church that day, Rachel should tell him that he had to take the child to school. When Father arrived at the church with the child, Rachel did exactly as Mother had instructed her. Rachel testified that Father became very angry, grabbed the child from Rachel, and told the child that "nobody wants you. Your sister doesn't want you here." When Rachel protested, Father backed her against some cabinets and stated, "I'll see you in court over this, baby." The director of the nursery called security to escort Father out of the building.

Again, there is clear evidence of Father's violations of the civility provision of the Plan, which is also against the court's orders. Accordingly, we hold that the evidence does not preponderate against the trial court's determination that Father should be held in contempt for violating the court's prior orders.

With respect to evidence of Father harassing Mother, the court made the following statements at the conclusion of the trial:

> There's nothing wrong with this child that can't be cured by the parents getting along. And I frankly, for the record, want it shown that [Mother] has bent over backwards, sir, to try to make you have this child in your life, and you have done nothing but absolutely harass her endlessly. It's going to cease today or you will go to jail.
>
> * * *
>
> Communication between [Father and Mother] will be by e-mail or fax only. You are restrained, enjoined and permanently enjoined from ever calling [Mother] at work, unless there is an emergency, period.
>
> * * *

> Do not get out of the car in [an] attempt to engage, until you-all become more peaceful toward each other, in any conversation. There's nothing to be said or talked about between you and [Mother]. When you pick up and deliver the child, do not get out of the car. Do not come to [Mother's] house unannounced. She can just as well call the police, as I'm surprised she hasn't. You have no business at her home, sir.

Based upon the court's findings, we cannot say that the evidence preponderates against the court's decision to hold Father in contempt for harassing Mother. This issue is without merit.

B.

An initial award of custody is "subject to such changes or modification as the exigencies of the case may require." Tenn. Code Ann. § 36-6-101(a)(1) (Supp. 2002). This court has noted that the initial judgment awarding custody "is *res judicata* and is conclusive in a subsequent application to change custody unless some new fact has occurred which has altered the circumstances in a material way so that the welfare of the child requires a change of custody." *Griffin v. Stone*, 834 S.W.2d 300, 301-02 (Tenn. Ct. App. 1992). The best interest of the child is the paramount consideration. *Musselman*, 826 S.W.2d at 922.

"Custody decisions are factually driven and require the careful consideration of numerous factors." *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). A petition to modify a custodial arrangement addresses itself to the wide and sound discretion of the trial court, and "we will not tamper with that discretion unless the facts demonstrate that the trier of fact has abused his or her discretion." *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997).

First, Father asserts that there was no material and substantial change in circumstances justifying the court's modification of the Plan. We disagree.

In the instant case, Father has a unique work schedule that the court attempted to accommodate so that Father could have ample time with his daughter; in fact, Father was afforded abundant flexibility with that schedule, provided he gave Mother sufficient notice and a copy of his weekly work schedule. However, because of Father's conduct in failing to provide Mother with sufficient notice and in refusing to provide Mother with his weekly schedules, this arrangement has not worked. Therefore, the court, in its discretion, altered that schedule, awarding Father "alternating weekends, 6:00 [p.m.] on Friday to 6:00 [p.m.] on Sunday." As we find that the trial court did not abuse its discretion in modifying the Plan, we will not disturb its decision.

Father next contends that the trial court erred in restricting his ability to visit the child's pre-school classroom. Kathleen Lanza, the headmistress at the child's pre-school, testified that Father's impromptu visits to the classroom when the child is in school cause her to exhibit immaturity and prevent her from fully interacting with the other children in the classroom. Ms. Lanza stated that,

in the past, Father would often arrive at school with the child late and interrupt the class that was already in progress. Ms. Lanza opined that this sort of behavior was "just kind of uncomfortable for the children in the middle of whatever they were doing, and it's hard for the teacher because she was having to stop what she was doing to try to talk to the parent."

In rendering its decision, the trial court held as follows:

> [Father] is further restrained and permanently enjoined until he proves himself to either the school or to this Court from being in this child's classroom while this child is trying to study. I have found nothing in the record but his inappropriate conduct which has caused disruptions in the classroom, and that will not take place anymore. He is enjoined from being in her classroom.

Based upon the testimony of Ms. Lanza, we find that the trial court did not abuse its discretion in modifying the Plan to enjoin Father from visiting his daughter's classroom.

Finally, Father asserts that the trial court erred in preventing Father from taking the child to any medical or dental appointments. Section 3.2.2 of the Plan provides that, while the parties "will consult with respect to major, non-emergency medical decisions" and that either party "may make emergency decisions affecting the health and safety of the child," Mother will make all other medical decisions "after consultation." However, the testimony at trial revealed that Father had been taking the child to the doctor without the prior knowledge or consent of Mother. Mother testified that, on more than one occasion, Father had shown up at the pediatrician's office without an appointment, demanding that the child be seen by the doctor. Mother later received a letter from the child's pediatrician, in which the doctor stated that she was withdrawing as the child's doctor. In the letter, the doctor cited the poor communication between the parents with respect to the child's medical care and noted that "often [the child's] presence in the office is unknown to the other parent." In addition, Father began taking the child to the dentist without the knowledge or consent of Mother.

After hearing the testimony on the medical matters affecting the child, the court ruled as follows:

> You will not take this child to a doctor or a dental appointment unless Mother asks you to do so. Mother is the decision maker as to the medical and dental needs of this child.

Father clearly violated the court's prior order with respect to non-emergency medical decisions when he began taking the child to the pediatrician and the dentist without consulting with Mother. Therefore, we find no abuse of discretion in the court's decision to modify the Plan to prevent Father from taking the child to any medical or dental appointments.

C.

Mother seeks her attorney's fees incurred on this appeal. We find that she is entitled to such an award and therefore remand this case to the trial court for a determination of a reasonable fee. *See **D v. K***, 917 S.W.2d 682, 687 (Tenn. Ct. App. 1995) (awarding reasonable attorney fees upon petition for rehearing and remanding to trial court for a determination of those fees).

IV.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Lawson S. Whitaker, III. This case is remanded for a determination of an award to Mother of her attorney's fees incurred on this appeal, for collection of costs, and for enforcement of the judgment below, all pursuant to applicable law.

_____
CHARLES D. SUSANO, JR., JUDGE