IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 16, 2005 Session

## MELODY D. DICKSON v. ROGER LEE DICKSON

**Appeal from the Chancery Court for Hamilton County**
**No. 95-1043      Howell N. Peoples, Chancellor**

---

**No. E2004-01680-COA-R3-CV FILED DECEMBER 5, 2005**

---

In this post-divorce case, Melody D. Dickson ("Mother") filed a complaint against her former husband, Roger Lee Dickson ("Father"), seeking to modify an order of the trial court awarding her $876 per month in child support. Mother sought an increase in child support and an award of her attorney's fees. In addition, Mother requested that Father be required to pay "the educational expenses of the minor children," who she had recently enrolled at a private school. Following a bench trial, the court ordered that Father's child support obligation be increased to $913.50 per month; ordered Father to pay the children's private school tuition; and ordered Father to pay Mother's attorney's fees. Father appeals. As modified, the trial court's judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed as Modified; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY and SHARON G. LEE, JJ., joined.

Phillip C. Lawrence, Chattanooga, Tennessee, for the appellant, Roger Lee Dickson.

Marvin Berke and Megan C. England, Chattanooga, Tennessee, for the appellee, Melody D. Dickson.

**OPINION**

I.

The parties were married on May 28, 1988. Two children were born to their union – Dianna Lee Dickson ("Dianna")[1] (DOB: October 31, 1990) and Danielle Marrianne Dickson ("Danielle") (DOB: February 14, 1992). By judgment entered July 12, 1996, the trial court determined that Father was guilty of inappropriate marital conduct and awarded Mother a divorce. In addition, the trial

---

[1]For ease of reference, we will refer to the children in the same manner as did the parties, *i.e.*, "Dianna" and "Danielle." No disrespect is intended by this informal approach.

court awarded Mother primary custody of the children and granted Father reasonable visitation rights. Father was ordered to pay $876 per month in child support.

On October 28, 2003, Mother filed a petition to modify Father's child support obligation, requesting that Father be ordered to pay for the "educational expenses" of the children, who had left a public school and were now attending the Baylor School, a private school in Chattanooga. In addition, Mother requested an increase in Father's "percentage" child support obligation and an award of her attorney's fees.

At the time of the hearing on Mother's petition – on May 17, 2004 – Dianna was in the seventh grade and in her second year at Baylor, while Danielle was in the sixth grade and in her first year. Mother, who testified first at the hearing, stated that Dianna received a scholarship to attend Baylor, and that the remaining tuition owed after the scholarship was $4,000. The children's paternal grandmother paid for Dianna's tuition at Baylor, but Father refused to pay the younger child's tuition when she was ready to start school in the fall of 2003. Mother testified that she asked Father to pay half of the $1,400 enrollment fee; she advised Father that she would pay the other half. Father agreed to obtain the money from his mother. However, Mother later learned that her former mother-in-law had stopped payment on the check. In order to cover the cost of Danielle's enrollment, Mother had to ask her boss for a salary advance. When the tuition money came due, the paternal grandparents refused to pay for Danielle's tuition, prompting Mother to put her house on the market. When the house didn't sell, Mother quit her job so she could access her 401(k) and pay Danielle's tuition. Mother later sold her vehicle in order to make the down payment on the 2004-2005 tuition. Mother's testimony revealed that she had paid over $16,000 for the children's education since 2002, as opposed to Father's family, who had paid approximately $7,200.

Father testified next. He acknowledged that he had made numerous perjurious statements with respect to his financial condition:

> Q: Well, just read to the Court how many [vehicles] you've got [listed on the loan application].
>
> A: Well, we've got an overvaluated [sic] Toyota Avalon.
>
> Q: You said overvaluated [sic]. That's $22,000. How much did you overvalue that for the bank?
>
> A: Well, whatever she told me to.
>
> Q: Whatever she told you to? You mean the banker?
>
> A: Yes. Uh-huh.

Q:      Oh, okay.  So you committed perjury because the banker told you to.  What's the next one you have?

A:      A '99 Ford F-150.  I perjured again.  It belongs to [my parents'] company.  A '97 Ford Taurus.

Q:      Is that one perjured or is that right?

A:      It's right.

Q:      Oh, okay.

A:      A '39 Ford pickup.  I perjured again.

Q:      And how much did you say that was worth?

A:      20,000.  It belongs to my dad.  A 1991 Ford van.

Q:      Did you perjure yourself on that?

A:      Yes.  Uh-huh.  A 2002 Toyota Solara.

Q:      Did you perjure yourself on that?

A:      Yeah.  Now, this one is right (indicating).

Q:      How much did you tell the bank that that one was worth?

A:      Which one?  This one (indicating)?

Q:      The 2002 Toyota – is it Solara?

A:      Yeah.  15,000.

Q:      Was that one you made up, or is that one –

A:      The company has got it, but I perjured myself.  And the house furnishings, I just estimated that.

Q:      At $75,000?

A:      I don't know.  How much do you have in your house?  I just guessed.

Q:      You just guessed?

A:      Yes, sir.

Q:      Do you think your furnishings are worth $75,000?

A:      Maybe not.

Father was later questioned about a different loan application on which he claimed to pay only $700 per month in child support:

Q:      Did you ever have child support payments in the amount of $700 to make a month? Is that what you wrote down over here?

A:      No. I pay 876 a month, 438 twice a month, the 10th and 25th.

Q:      Well, why did you tell them you only had to pay out $700 a month in child support payments?

A:      I'm sorry. I guess I perjured myself again. I'm sorry. I'm not very good with figures.

Q:      Well, you were pretty good at adding those together, weren't you, when I asked you about it?

To refute Father's claim that he was unable to afford the private school tuition for the children, Mother's attorney asked the following questions:

Q:      Let me ask you this: Did you not purchase a four-wheeler, a 2000 Suzuki Quad Runner for $5,795 in April of 2000, at the very time that your ex-wife is trying to get you to pay money to Baylor?

A:      Yes, sir, I did. But that's $139 a month, whatever my payments were.

Q:      Well, I'll show you this. Is this the document where you borrowed the money to buy the four-wheeler?

A:      Yes, sir, it looks like it is.

Q:     Okay.  In other words, you could purchase this four-wheeler but you couldn't send your child to private school; is that what you're telling us?

A:     I bought it because my kids love to ride them and I didn't have one at home, so that's why I bought it.

Q:     Oh, okay.

A:     And I did finance it.

* * *

Q:     Specifically on 8/13/2002, did you and your wife borrow $10,000 on a new loan from Frontier Bank?

A:     I believe so.

Q:     Could you not have contributed that to your children's education?

A:     I'd have to get with my wife and see what that was for.

Q:     Do you remember doing this?

A:     Well, my wife and I jointly did it, yes, sir.

Q:     You don't remember doing it yourself?

A:     I don't remember what we had to use the money for, sir, no, sir.  I don't know if my wife needed it or what.

* * *

Q:     But the check went out to you or [your wife]; is that right?

A:     Yes, sir, that's what it says.

* * *

Q:     Did you not tell your daughters that unless they came to live with you, you wouldn't pay any Baylor tuition?

-5-

* * *

A:    Can I clarify that?

Q:    Well, I'm just asking you first if you did it, and then you can clarify it.

A:    Well, I need to clarify it to answer yes or no.

Q:    You can answer that yes or no.

A:    I told them the only way I could afford to do that was if I didn't have to pay their child support, and then I didn't know if we'd be able to pay it. That is how it was meant instead of it being misconstrued. I told them that's the only way I could possibly even do it, but that won't even cover the amount that it would cost to go there. I mean, she and I jointly don't have the money to even do it.

Q:    So you did tell them that if they came to live with you that you would pay the Baylor tuition?

A:    No, that we could try is all.

At the conclusion of the hearing, the trial court, in its memorandum opinion, found, in pertinent part, as follows:

> The next item has to do with private school tuition at Baylor. At the time of these parties' divorce, the two children were attending public schools. The children are now enrolled in private school, and in the opinion of the Court that would constitute by and of itself a material change of circumstances. And based on the child support guidelines and the authority of Barnett versus Barnett found at 27 S.W.3d 904, [Father] is required to pay the private school tuition.
>
> The Court finds there should not be any downward deviation based on [Mother's] income. And, in fact, the evidence is that [Mother], when the first child was accepted at Baylor, wound up quitting her job so she could cash in her 401(k) in order to pay that child's tuition.
>
> In addition, the evidence establishes that [Father] is able to go out and borrow funds to buy four-wheelers and to borrow lump sums of $30,000. *And it would appear that he has financial abilities that*

-6-

*perhaps are not demonstrated to the Court by the evidence but, in fact, he otherwise has those financial abilities.*

Finally on the matter of child support itself, the Court is not satisfied that it knows exactly how much [Father] earns. There are records that establish $800 a week. The evidence is that before the divorce he was paid in cash in addition to payments made that show up on records. After the divorce, that practice of paying in cash allegedly ends. Unfortunately the proof is such that the Court doesn't know whether that's true or not. In 26 years on the bench, there may have been one other case where a party so readily admitted that he had perjured himself, not once or twice but over and over again. Based on the guidelines at $800 a week, he should be paying $913.50 a month in child support.

(Emphasis added). In addition, the trial court ordered Father to pay Mother's attorney's fees of $5,550. From this judgment, Father appeals.

## II.

In this non-jury case, our review of the trial court's factual findings is *de novo*; however, the case comes to us with a presumption that those findings are correct – a presumption that we must honor unless the evidence preponderates against them. Tenn R. App. P. 13(d); ***Musselman v. Acuff***, 826 S.W.2d 920, 922 (Tenn. Ct. App. 1991). Our search for the preponderance of the evidence is tempered by the principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such determinations are entitled to great weight on appeal. ***Massengale v. Massengale***, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995); ***Bowman v. Bowman***, 836 S.W.2d 563, 566, 567 (Tenn. Ct. App. 1991).

## III.

## A.

Father's issues on appeal can be succinctly stated as follows:

1. Did the trial court err in increasing Father's child support obligation?

2. Did the trial court err in ordering Father to pay all of the children's private school tuition?

3. Did the trial court abuse its discretion in ordering Father to pay Mother's attorney's fees?

We will address each of these issues in turn.

B.

First, Father argues that the trial court erred in increasing his child support obligation from $876 per month to $913.50 per month. We agree.

In cases where a party seeks a modification of an existing child support order based upon an increase in the obligor parent's income, a court can grant relief only if "there is found to be a significant variance, as defined in the child support guidelines . . ., between the guidelines and the amount of support currently ordered." Tenn. Code Ann. § 36-5-101(a)(1)(A) (Supp. 2004). The child support guidelines define a significant variance as "at least 15% if the current support is one hundred dollars ($100.00) or greater per month." Tenn. Comp. R. & Regs., ch. 1240-2-4-.02(3) (2003).

When Mother filed her petition to modify, Father's child support obligation was $876 per month. Therefore, before the court could modify this amount by increasing it, the court was required to find that the amount of support calculated under the child support guidelines – based upon Father's current income – is 15% greater than the amount he was paying. Accordingly, unless Father's support obligation under the guidelines would amount to more than $1,007 per month (which would be 15% more than his previously-decreed obligation of $876), then there is no significant variance and no increase is justified. While the trial court in the instant case *suspected* that Father had income of more than $800 per week, the court, nevertheless, utilized the $800 figure when it made its "significant variance" analysis. The court took this approach because there was no hard evidence that Father's income was more than this amount.

In order to calculate Father's net income based upon a weekly gross of $800, we must first calculate the "amount of withholding tax deducted for a single wage earner claiming one withholding allowance." Tenn. Comp. R. & Regs., ch. 1240-2-4-.03(4)(b)(1) (2003). In 2004, based upon the Internal Revenue Service's Circular E, Employers' Tax Guide in effect at that time, the amount to be withheld from a weekly $800 paycheck for a "single wage earner" with one withholding allowance was $113. We next calculate the amount of the FICA tax, which, in 2004, was set at 7.65%[2]; 7.65% of $800 equals $61.20. Deducting $113 and $61.20 from $800 leaves us with a weekly net income of $625.80 for Father, or $626 after rounding up. *See* Tenn. Comp. R. & Regs., ch. 1240-2-4-.03(g)(5) (2003). Because Father has two children, we must take 32% of his net income to determine the appropriate amount of weekly child support. *Id*. This computation results in a child support figure of $200.32 per week. In order to calculate Father's monthly child support obligation, we multiply $200.32 by 52 weeks, and then divide the product by 12, resulting in a monthly total of $868. This amount does not constitute a significant variance, as it is actually *less* than the amount of child support Father was paying. Accordingly, we reverse the trial court's

_____

[2] 6.2% Social Security plus 1.45% Medicare.

decision to increase Father's child support obligation and we reinstate the original child support award of $876 per month, retroactive to the date of the trial court's order increasing support.

Because private school tuition is at issue in this case, we find it necessary to point out that enrollment in a private school, with its attendant tuition charge, cannot be used by a custodial parent as a predicate to revisit an obligor's "percentage" child support obligation. The Supreme Court in *Barnett v. Barnett*, 27 S.W.3d 904 (Tenn. 2000) clearly stated that private school tuition and related expenses are *in addition to*, rather than *an element of*, the "percentage of child support computed under the guidelines." *Id.* at 907. The child support guidelines are clear as to what is required before a court can revisit the "percentage" child support calculation; there must be a "significant variance" as defined in the guidelines. While attendance at a private school can form the basis for a new hearing on the subject of an add-on for "extraordinary educational expenses," it, standing alone, cannot form the basis for an increase in the "percentage" child support.

C.

Next, Father asserts that the trial court erred in ordering him to pay the full amount of the children's private school tuition. The fact that the children are now attending a private school – which they were not doing at the time of the parties' divorce – in and of itself constitutes a substantial and material change of circumstances. In arguing against this assertion, Father correctly points out that this court has held that the "significant variance" test has supplanted the "substantial and material change of circumstances" test, *see Turner v. Turner*, 919 S.W.2d 340, 342-43 (Tenn. Ct. App. 1995); but this is only for the purpose of determining whether a modification of "percentage" child support is in order. Because the imposition of private school tuition is an add-on, rather than a part of the computation of the "percentage of child support . . . under the guidelines," the significant variance test is not applicable; when dealing with such "extraordinary educational expenses," we must determine whether a substantial and material change of circumstances has occurred as it pertains to the subject of "extraordinary educational expenses" as an add-on to the "percentage" child support amount. We hold – as did the trial court in the instant case – that such a change has occurred by virtue of the children's post-divorce enrollment at the Baylor School.

In *Barnett*, the leading case on the issue of private school tuition as an addition to "percentage" child support, the Supreme Court held that "(1) the [child support] guidelines contemplate private school tuition to be an 'extraordinary educational expense' because the tuition exceeds or departs from the cost of public schooling; and that (2) the amount of the expense must be added to the obligor's percentage of child support computed under the guidelines." *Id.*, 27 S.W.3d at 907. Father urges this court to further expound upon the meaning of the High Court's ruling in *Barnett*. He believes *Barnett*, when literally read, stands for the proposition that trial courts must award private school tuition, even if such an award has the effect of impoverishing the obligor. The crux of Father's argument is set forth in his brief as follows:

> At some level it must be recognized that a parent's decision to send a child to a private school is not infallible and that the parent is not

exercising good judgment in making that decision. If the decision in the ***Barnett*** case stands for the notion that a parent's choice to send a child to private school cannot be challenged by the other parent or a court, then that ruling must be modified or explained to allow the rebuttable presumption of the Guidelines that the parent's choice is correct to be overcome when there is no practical way of meeting the financial obligation when the incomes of the two parents are insufficient to meet the cost.

In making this argument, Father relies on the language of ***Barnett***, which states that "[t]he guidelines' use of the word 'shall' leaves a trial court no discretion in adding extraordinary educational expenses to the obligor's computed percentage." ***Id.***, at 907. The issue raised by Father was not raised in ***Barnett***. While we acknowledge the Supreme Court's use of the mandatory "shall" language in the ***Barnett*** case, we believe Father's interpretation of that language is more expansive than intended by the Supreme Court.

As we read ***Barnett***, a court is required to add the "extraordinary educational expenses" to the "percentage" child support figure. This does not mean, however, that in all cases the obligor parent is responsible for the resulting figure. The guidelines provide – as acknowledged in ***Barnett*** – that there is a "*rebuttable presumption* in all child support cases that the amount of child support determined by an application of the[] guidelines is the correct amount to be awarded *unless . . . the application of the guidelines would be unjust or inappropriate in a particular case*." Tenn. Comp. R. & Regs., ch. 1240-2-4-.01(2) (2003) (emphasis added); *see also* ***Barnett***, 27 S.W.3d at 907-08. This means that when the *mandatory add-on* of the "extraordinary educational expenses" has been completed, a court must – if asked to – determine whether the "percentage" child support when coupled with the "extraordinary educational expenses" has resulted in a figure which "would be unjust or inappropriate" under the circumstances of the case before it. The add-on is mandatory as a part of the *method of computation* under the guidelines; but this is not to say that a court must then, regardless of the facts, decree the payment of the full amount of the resulting figure by the obligor. While there is a presumption, rebuttable in nature, that the new figure is the correct one, a court can still decide that something less than 100% of the "extraordinary educational expenses" – all the way down to zero – is appropriate under Tenn. Comp. R. & Regs., ch. 1240-2-4-.01(2) (2003); *see also* ***Barnett***, 27 S.W.3d at 907-08. In the event a court decides that something less than the full amount of the "extraordinary educational expenses" is appropriate, the reduced figure so found plus the "percentage" child support figure – assuming the latter figure is not contested and rebutted – would be the correct child support obligation.

The trial court in the instant case determined that Father should pay the full amount of the children's private school tuition. We respectfully disagree, because we have concluded that the evidence in the record rebuts the presumption that this is the "correct amount to be awarded." Tenn. Comp. R. & Regs., ch. 1240-2-4-.01(2).

The only hard evidence with respect to Father's income is that he receives a gross salary of $800 per week from his family's business. While the trial court was suspicious of this testimony – and we can understand why he was – there was no countervailing evidence of his salary or other income. Thus, even though the record is clear – as found by the trial court – that Father lied "not once or twice but over and over again," we are not left with an alternative figure upon which to base our analysis. If his income is more than $800 gross salary per week, what is it? We are left to speculate about the answer to this question. As the trial court noted in its memorandum opinion, "[a]nd it would appear that he has financial abilities that perhaps *are not demonstrated to the court by the evidence*." (Emphasis added).

A weekly gross of $800 figures out to an annual gross of $41,600. From this amount, we deduct Father's annual "percentage" child support obligation of $10,512, *i.e.*, $876 per month times 12 months, leaving Father with $31,088. For the school year 2004-2005, the total tuition for the two children, after deducting Dianna's scholarship, was $14,736. When this amount is deducted from $31,088, Father is left with $16,352 *before he pays his federal income tax and FICA tax on a gross income of $41,600*. This means that Father would have an annual child support obligation of $25,248 ($10,512 + $14,736) while having less than $1,000 per month to live on.

We are not unmindful of the testimony in the record indicating that Father and his present wife had jointly borrowed money since the divorce; that he had received an advance from his sister – later repaid when he and his wife sold their house;[3] and that he had the wherewithal to buy a four-wheeler. We also recognize that Father told his children that he would try to pay the Baylor School tuition if they would come to live with him.[4] We are also aware that Father told Mother that he would help her with the younger child's enrollment fee at Baylor, but we note that he sought the assistance of his parents for this purpose. We cannot impose an obligation upon Father based upon his parents' largess, his sister's generosity, or the joint ability of him and his wife to borrow money. The issue is what is appropriate and just given his proven income, *i.e.*, $800 gross per week. In terms of income, any other figure is speculative in nature. While Father is an admitted perjurer – and we have quoted extensively from his testimony to demonstrate this – we do not have evidence of a different income figure; if we had evidence of a higher income, we would probably embrace it in the subject analysis, given Father's total lack of credibility.

As we have intimated in this opinion, the evidence in the record preponderates in favor of a finding that the add-on of the full amount of the children's tuition would be unjust and inappropriate in this case. However, this is not to say that Husband should not be burdened with some portion of the tuition expense. On the contrary, we believe the evidence clearly supports a

---

[3]We recognize that gifts are included in the definition of gross income under the guidelines. *See* Tenn. Comp. R. & Regs., ch. 1240-2-4-.03(3)(a). However, in this case, the sister's advance – which may have been a gift in one sense of the word – was apparently used by Father to close on the purchase of his new house before his old house was sold. In any event, we do not believe that this advance by his sister should be considered as a part of his gross income since it was repaid when the old house was sold.

[4]He testified that he could probably do this if he did not have to pay Mother the "percentage" child support.

finding that it would be just and appropriate to order Father to pay half of the children's net tuition, *i.e.*, tuition after deducting all credits representing scholarships against tuition. We so decree. We further hold that this obligation is for all semesters commencing from and after the date upon which Mother filed her petition to modify. We modify the trial court's award accordingly.

D.

Finally, Father contends that the trial court abused its discretion in ordering him to pay Mother's attorney's fees, in the amount of $5,550. We disagree.

The question of whether to award attorney's fees is within the discretion of the trial court, and an appellate court is not to disturb the trial court's award unless the evidence preponderates against it. ***Barnhill v. Barnhill***, 826 S.W.2d 443, 456 (Tenn. Ct. App. 1991). Under the abuse of discretion standard, "a trial court abuses its discretion only when it 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001) (citation omitted).

The trial court, in ordering Father to pay Mother's reasonable attorney's fees, stated that Mother's attorney "shall submit a statement reflecting both the services rendered to [Mother] in this case and the corresponding time devoted to rendering each such service, and a copy of such time statement shall be served upon opposing counsel." In response to this order, Mother's attorney filed a time statement with the court stating that he had spent 22.2 hours working on Mother's case, at an hourly rate of $250, for a total of $5,550. Following the submission of this time statement, the trial court ordered Father to pay the full amount of $5,550. We find no abuse of discretion in the trial court's decision to order Father to pay fees in this amount.

Father raises as an issue – for the first time on this appeal – the insufficiency of the statement submitted by Mother's attorney, contending that the statement contained no information "as to how many hours were spent in the trial of the case, what discovery was conducted, whether depositions were taken, or any other fact upon which the trial court could have judged reasonableness of the fee based upon the effort expended." Our thorough review of the record reveals that at no time did Father raise this issue before the trial court. It is well-settled that issues not raised at the trial court level may not be raised for the first time on appeal. ***Simpson v. Frontier Cmty. Credit Union***, 810 S.W.2d 147, 153 (Tenn. 1991). We therefore decline to address this issue further.

IV.

The judgment of the trial court, as modified, is affirmed. This case is remanded to the trial court for enforcement of the trial court's judgment, as modified, and for the collection of costs assessed below, all pursuant to applicable law. Exercising our discretion, we tax the costs of this appeal half to the appellant, Roger Lee Dickson, and half to the appellee, Melody D. Dickson.

_____
CHARLES D. SUSANO, JR., JUDGE